# UNITED STATES *v.* CHOCTAW NATION AND CHICKASAW NATION.

# WICHITA AND AFFILIATED BANDS OF INDIANS *v.* CHOCTAW NATION, CHICKASAW NATION AND UNITED STATES.

# CHOCTAW NATION AND CHICKASAW NATION *v.* UNITED STATES AND WICHITA AND AFFILIATED BANDS OF INDIANS.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 88, 89, 90.   Argued March 7, 8, 9, 1900.—Decided December 10, 1900.

On the 4th day of June, 1891, the United States and the Wichita and Affiliated Bands of Indians entered into an agreement whereby the Indians ceded to the United States a tract of land which is described in the opinion of the court in this case, and the United States agreed in consideration thereof that out of the territory so ceded there should be allotted to each member of the Wichita and Affiliated Bands of Indians in the Indian Territory, native and adopted, one hundred and sixty acres of land in the manner and form described in the agreement. This agreement was ratified by the Indian Appropriations Act of March 2, 1895, which further conferred jurisdiction upon the Court of Claims, to hear and determine the claim of the Choctaws and the Chickasaws to a right, title

and interest in the lands so ceded, and to render judgment thereon, with a right of appeal to this court.    Pursuant to that act this suit was brought.    The Court of Claims, after reciting that the lands in dispute were acquired by the United States "*in trust* for the settlement of Indians thereon, and in trust and for the benefit of said claimant Indians when the aforesaid trust shall cease;" that "the Wichita and Affiliated Bands of Indians were by the United States located within the boundaries of the lands hereinbefore described;" that they "now number not more than one thousand and sixty persons;" and that the location of the Wichitas and Affiliated Bands within said boundaries was "for the purpose of affording them permanent settlement therein," adjudged that the lands in dispute had been acquired and were held by the United States in trust for the purpose of settling Indians thereon, and that whenever that purpose was abandoned as to the whole or any part thereof then all the lands not so devoted to Indian settlement should be held in trust by the United States for the Choctaw and Chickasaw Indians exclusively. It was also adjudged that the members of the Wichita and Affiliated Bands, not exceeding one thousand and sixty, were equitably entitled to one hundred and sixty acres of land each out of the lands in dispute and that the same should be set apart to them by the United States, due regard being had to any improvements made thereon by them respectively for their permanent settlement.    It was further adjudged that the Choctaw and Chickasaw Nations were in law and equity entitled to and were the owners of such of the lands ceded to the United States by the Wichita and Affiliated Bands as remained, after satisfying the provisions for the Wichitas and Affiliated Bands, and that in the event of the sale thereof by the United States, the Indian plaintiffs should be entitled to and receive the proceeds of such sale.    This judgment being brought here on appeal, this court, in its opinion, carefully reviewed all the legislation, and all the Indian treaties on the subject, and, as a result, *Held,* that for the reasons given the decree must be reversed with directions to dismiss the petition of the Choctaw and Chickasaw Nations, and to make a decree in behalf of the Wichita and Affiliated Bands of Indians fixing the amount of compensation to be made to them on account of such lands in the Wichita Reservation as are not needed in order to meet the requirements of the act of Congress of March 2, 1895, c. 188, and for such further proceedings as may be consistent with law and with this opinion.

THE case is stated in the opinion of the court.

*Mr. George T. Barnes* and *Mr. Jeremiah M. Wilson* for the Choctaw Nation.

*Mr. Philip Walker* and *Mr. Andrew A. Lipscomb* for the Wichita and Affiliated Bands of Indians.    *Mr. Josiah M. Vale* and *Mr. William C. Shelley* were on their brief.

*Mr. Attorney General* and *Mr. Charles C. Binney* for the United States.

*Mr. Halbert E. Paine* for the Chickasaw Nation. *Mr. Robert L. Owen* filed a brief on behalf of the Choctaw Nation.

MR. JUSTICE HARLAN delivered the opinion of the court.

On the 4th day of June, 1891, an agreement was entered into between commissioners on behalf of the United States and the Wichita and Affiliated Bands of Indians, in the Indian Territory, whereby those Indians did "cede, convey, transfer, relinquish, forever and absolutely, without any reservation whatever," to the United States "all their claim, title and interest of every kind and character" to the land embraced in the following boundary : " Commencing at a point in the middle of the main channel of the Washita [Wichita] River where the 98th meridian of west longitude crosses the same, thence up the middle of the main channel of said river to the line of 98° 40' west longitude, thence on said line of 98° 40' due north to the middle of the channel of the main Canadian River, thence down the middle of the channel of said main Canadian River to where it crosses the 98th meridian, thence due south to the place of beginning." 28 Stat. 876, 895, c. 188.

In consideration of that cession, it was agreed on behalf of the United States that out of the territory ceded there should be allotted to each member of the Wichita and Affiliated Bands of Indians in the Indian Territory, native and adopted, one hundred and sixty acres of land in the manner and form described in the agreement. It was provided that upon the allotments being made the titles should be held in trust for the allottees for a period of twenty-five years, in the manner and to the extent provided for in the act of Congress of February 8, 1887, 24 Stat. 388, 389, c. 119; and at the expiration of that period the titles should be conveyed in fee simple to the allottees, or their heirs, free from all incumbrances. 28 Stat. 876, 895, 896, c. 188.

This agreement recited that in addition to the allotments pro-

vided for, and the other benefits to be received, the Wichita and Affiliated Bands of Indians claimed and insisted "that further compensation, in money, should be made to them by the United States, for their possessory right in and to the lands above described in excess of so much thereof as may be required for their said allotments." And it was stipulated in the agreement that "the question as to what sum of money, if any, shall be paid to said Indians for· such surplus lands shall be submitted to the Congress of the United States, the decision of Congress thereon to be final and binding upon said Indians; provided, if any sum of money shall be allowed by Congress for surplus lands it shall be subject to a reduction for each allotment of land that may be taken in excess of one thousand and sixty at that price per acre, if any, that may be allowed by Congress." Art. 5.

It was further stipulated in the agreement that "there shall be reserved to said Indians the right to prefer against the United States any and every claim that they may believe they have the right to prefer, save and except any claim to the tract of country described in the first article of this agreement." 28 Stat. 876, 896, c. 188.

This agreement of 1891 was ratified by the act of Congress known as the Indian Appropriation Act of March 2, 1895. 28 Stat. 876, 894, 897, c. 188.

By that act it was among other things provided:

"The compensation to be allowed in full for all Indian claims to these lands which may be sustained by said court in the scrip hereinafter provided for shall not exceed one dollar and twenty-five cents per acre for so much of said land as will not be required for allotment to the Indians as provided in the foregoing agreement, subject to such reduction as may be found necessary under Article 5 of said agreement: *Provided*, That no part of said sum shall be paid except as hereinafter provided."

"That whenever any of the lands acquired by this agreement shall, by operation of law or proclamation of the President of the United States, be open to settlement, they shall be disposed of under the general provisions of the homestead and town-site laws of the United States: *Provided*, That in addition to the

land-office fees prescribed by statute for such entries the entry-man shall pay one dollar and twenty-five cents per acre for the land entered at the time of submitting his final proof : . . . *Provided*, That said lands shall be opened to settlement within one year after said allotments are made to the Indians.

"That sections 16 and 36, 13 and 33, of the lands hereby acquired, in each township, shall not be subject to entry, but shall be reserved, sections 16 and 36 for the use of the common schools, and sections 13 and 33 for university, agricultural college, normal schools and public buildings of the Territory and future State of Oklahoma; and in case either of said sections or parts thereof is lost to said Territory by reason of allotment under this act or otherwise the Governor thereof is hereby authorized to locate other lands not occupied in quantity equal to the loss : *Provided*, That the United States shall pay the Indians for said reserved sections the same price as is paid for the lands not reserved.

"That as fast as the lands opened for settlement under this act are sold, the money received from such sales shall be deposited in the Treasury subject to the judgment of the court in the suit herein provided for, less such amount, not to exceed fifteen thousand dollars, as the Secretary of the Interior may find due Luther H. Pike, deceased, late delegate of said Indians, to be retained in the Treasury to the credit and subject to the drafts of the legal representative of said Luther H. Pike : *Provided*, That no part of said money shall be paid to said Indians until the question of title to the same is fully settled.

"That as the Choctaw and Chickasaw Nations claim to have some right, title and interest *in and to the lands ceded by the foregoing agreement* [the agreement above referred to], which claim is controverted by the United States, jurisdiction be and is hereby conferred upon the Court of Claims to hear and determine the said claim of the Choctaws and Chickasaws, and to render judgment thereon, it being the intention of this act to allow said Court of Claims jurisdiction, so that the rights, legal and equitable, of the United States and the Choctaw and Chickasaw Nations and the Wichita and Affiliated Bands of Indians in the premises, shall be fully considered and determined, and

to try and determine all questions that may arise on behalf of either party in the hearing of said claim; and the Attorney General is hereby directed to appear in behalf of the Government of the United States, and either of the parties to said action shall have the right of appeal to the Supreme Court of the United States: . . . *And provided further*, That nothing in this act shall be accepted or construed as a confession that the United States admit that the Choctaw and Chickasaw Nations have any claim to or interest in said lands or any part thereof. That said action shall be presented by a single petition making the United States and the Wichita and Affiliated Bands of Indians parties defendant, and shall set forth all the facts on which the said Choctaw and Chickasaw Nations claim title to said land. . . . *And provided*, That it shall be the duty of the Attorney General of the United States, within ten days after the filing of such petition, to give notice to said Wichita and Affiliated Bands through their agents, delegates, attorneys, or other representatives of said bands, that said bands are made defendants in said suit, of the purpose of said suit, that they are required to make answer to said petition, and that Congress has, in accordance with article 5 of said agreement, *adopted this method of determining their compensation, if any.*"

It was also provided that the Court of Claims "shall receive and consider as evidence in the suit everything which shall be deemed by said court necessary to aid it in determining the questions presented, and tending to shed light on the claim, rights and equities of the parties litigant, and issue rules on any Department of the Government therefor if necessary." 28 Stat. 876, 897, 898, c. 188.

Pursuant to the above act the present suit was brought in the Court of Claims by the Choctaw and Chickasaw Indians against the United States and the Wichita and Affiliated Bands of Indians.

A diagram which was incorporated into the opinion of the Court of Claims is here reproduced to show the land ceded by the Wichita and Affiliated Bands of Indians. It is sufficiently accurate for the purposes of the present discussion.

Opinion of the Court.

Tract 5, marked "Wichitas," is the particular land now in dispute, containing, it is stated, 743,257.19 acres; and, with tract 4, marked "Cheyennes and Arrappahoes," tract 6, marked "Kiowas, Comanches and Apaches," and tract 7, marked "Greer Co.," constituted what has been known as the "Leased District," containing, it is supposed, 7,713,239 acres. That District, it will be observed from the diagram, did not extend west of the 100th degree of west longitude.

It may be here remarked that according to the census report for 1890 the Choctaws then numbered between 14,000 and 15,000 people, of whom about 10,000 were Indians and about 4500 were of African descent; the Chickasaws about 7000, of whom about 3400 were Indians and 3700 were of African descent; and the Wichitas and Affiliated Bands, known as Caddoes, Wacoes, Towacanies, Keechies, Delawares and Ionies, about 1100 people, of whom not exceeding 175 were Wichitas and about one half Caddoes.

The decree of the Court of Claims recited that by the treaties between the United States and the Choctaw Nation or tribe of Indians, and between the United States and the Choctaw and Chickasaw Nations or tribes of Indians, the lands in dispute and other lands were acquired by the United States "*in trust* for the settlement of Indians thereon, and *in trust* and *for the benefit* of said claimant Indians when the aforesaid trust shall cease;" that "the Wichita and Affiliated Bands of Indians were by the United States located within the boundaries of the lands hereinbefore described;" that they "now number not more than one thousand and sixty persons;" and that the location of the Wichitas and Affiliated Bands within said boundaries was "for the purpose of affording them permanent settlement therein."

It was then adjudged—Mr. Justice Peele dissenting—that the lands in dispute had been acquired and were held by the United States in trust for the purpose of settling Indians thereon, and that whenever that purpose was abandoned as to the whole or any part thereof then all the lands not so devoted to Indian settlement should be held in trust by the United States for the Choctaw and Chickasaw Indians exclusively.

It was also adjudged and decreed that the members of the Wichita and Affiliated Bands, not exceeding one thousand and sixty, were equitably entitled to one hundred and sixty acres of land each out of the lands in dispute and that the same should be set apart to them by the United States, due regard being had to any improvements made thereon by them respectively for their permanent settlement.

It was further adjudged that the Choctaw and Chickasaw Nations were in law and equity entitled to and were the owners of such of the lands ceded to the United States by the Wichita and Affiliated Bands as remained, after satisfying the provisions for the Wichitas and Affiliated Bands, and that in the event of the sale thereof by the United States the Indian plaintiffs should be entitled to and receive the proceeds of such sale.

From this decree the United States, the Wichita and Affiliated Bands, and the Choctaw and Chickasaw Nations severally appealed. 34 C. Cl. 17.

The fundamental question to be determined on these appeals arises out of the treaty concluded April 28, 1866, between the United States and the Choctaw and Chickasaw Nations, 14 Stat. 769, relating to the lands constituting what has been known as the Leased District, north of Red River and between the 100th and 98th degrees of west longitude—the lands marked on the above map as tracts 4, 5, 6 and 7. By that treaty the Choctaws and the Chickasaws, in consideration of the sum of $300,000, *ceded* to the United States the territory known as the Leased District.

The Government insists that this cession was absolute and unaccompanied by any trust upon the termination or abandonment of which the Indians would be entitled either to the territory ceded or to the proceeds of its sale.

The Choctaw and Chickasaw Nations deny such to be the effect of the treaty of 1866, and insist that the United States took the lands *in trust* to be used only for the settlement of Indians, and that on the abandonment of such trust the lands reverted, or should be adjudged to have reverted, to the Choctaws and Chickasaws.

The Wichita and Affiliated Bands of Indians contend that

they are entitled to compensation in money for all the lands left in the territory in dispute after making the allotments provided for in the agreement of 1891, and that it should have been so adjudged.

The Choctaws also contend that they once owned, by transfer from the United States, a vast body of lands west of the Leased District, for which they have never received anything, and that the treaty of 1866 must be interpreted in the light of that fact.   What connection such a fact, if it had any existence, could have with the construction of the treaty of 1866 it is not easy to perceive.   But as the proposition just stated was the subject of much consideration in the Court of Claims, and as it is earnestly pressed upon our attention, we will first inquire whether the Choctaws ever owned any lands west of the Leased District, that is, west of the 100th degree of west longitude, and then bring into view the circumstances leading up to the treaty of 1866 which, it is argued, throw light on its interpretation.   This being done, we will examine the provisions of that treaty so far as they bear upon the title to the particular lands in dispute.

I. By a treaty concluded August 24, 1818, an Indian tribe called the Quapaws, in consideration of certain promises and stipulations, did " cede and relinquish" to the United States all the lands within the following boundaries:  " Beginning at the mouth of the Arkansaw River; thence extending up the Arkansaw to the Canadian Fork, and up the Canadian Fork *to its source;* thence south to Big Red River, and down the middle of that river to the Big Raft.; thence, a direct line, so as to strike the Mississippi River, thirty leagues in a straight line, below the mouth of the Arkansaw; together with all their claims to lands east of the Mississippi and north of the Arkansaw River, included within the colored lines 1, 2 and 3 on the above map,[1] with the exception and reservation following, that is to say: the tract of country bounded as follows: Beginning at a point on the Arkansaw River, opposite the present post of Arkansaw, and running thence, a due southwest course, to the

---

[1] A map which accompanied the treaty of 1818.

Washita [Wichita] River; thence, up that river, to the Saline Fork; and up the Saline Fork to a point from whence a due north course would strike the Arkansaw River at the Little Rock; and thence, down the right bank of the Arkansaw, to the place of beginning; which said tract of land, last above designated and reserved, shall be surveyed and marked off, at the expense of the United States, as soon as the same can be done with convenience, and shall not be sold or disposed of, by the said Quapaw tribe or nation, to any individual whatever, nor to any State or nation, without the approbation of the United States first had and obtained." Art. 2, 7 Stat. 176.

Observe in this boundary the words "extending up the Arkansaw to the Canadian Fork, and up the Canadian Fork to its *source*." One of the questions much discussed is whether the Quapaws owned and really intended to cede lands situated as far west as the source of the Canadian Fork or river—that point being far west of the 100th degree of west longitude. Did the United States understand that it acquired by the Quapaw treaty of 1818 lands as far west at that time as the *source* of the Canadian Fork or river, which (as is now known, but was not known in 1818) rises in the northeastern part of New Mexico, 36° north latitude by 105° west longitude, while the Red River rises in the Staked Plains and arid table lands near the eastern border of New Mexico, about latitude 35° north and longitude 103° 10′ west? This question cannot well be determined without referring to other documents pertinent to the present inquiry.

By a treaty signed within a few months after the date of the treaty with the Quapaws, that is, on February 22, 1819, the United States and Spain agreed :

. "ART. 3. The boundary line between the two countries west of the Mississippi shall begin on the Gulph of Mexico, at the mouth of the river Sabine, in the sea, continuing north, along the western bank of that river, to the 32d degree of latitude; thence, by a line due north, to the degree of latitude where it strikes the Rio Roxo of Natchitoches, or Red River; then following the course of the Rio Roxo westward, *to the degree of longitude* 100 *west from London and* 23 *from Washington;*

then crossing the said Red River, and running thence; by a line *due north*, to the river Arkansas; thence, following the course of the southern bank of the Arkansas, to its source, in latitude 42 north; and thence, by that parallel of latitude, to the South Sea. The whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, 1818. But if the source of the Arkansas River shall be found to fall north or south of latitude 42, then the line shall run from the said source due south or north, as the case may be, till it meets the said parallel of latitude 42, and thence, along the said parallel, to the South Sea.  .  .  .  The two high contracting parties agree to cede and renounce all their rights, claims and pretensions to the territories described by the said line; that is to say; the United States hereby cede to His Catholic Majesty and renounce forever all their rights, claims and pretensions to the *territories lying west* and south of the above described line; and, in like manner, His Catholic Majesty cedes to said United States all his rights, claims and pretensions to any territories east and north of the said line; and, for himself, his heirs and successors, renounces all claim to the said territories forever." 8 Stat. 252, 254, 256.

We here remark that the words in this treaty, " then following the course of the Rio Roxo [Red River] westward, to the degree of longitude 100 west from London and 23 from Washington, then crossing the said Red River, and running thence, by a line due north, to the river Arkansas," indicate that in the judgment of the United States at the time the treaty with Spain was signed the lands west of the 100th degree of west longitude and south of the 42° parallel of latitude constituted or should constitute part of the possessions of that country.

The treaty with Spain, although signed in 1819, was not finally ratified until February 19, 1821. But between the signing of that treaty and its ratification, namely, on the 18th day of October, 1820, a treaty was concluded between the United States and the Choctaw Nation, whereby the latter ceded to the United States certain lands east of the Mississippi River. The main object of that treaty with the Choctaws was to exchange some of the lands then occupied by them for " a coun-

try beyond [west of] the Mississippi, where all, who live by hunting and will not work, may be collected and settled together." The second article of that treaty was in these words: "For and in consideration of the foregoing cession on the part of the Choctaw Nation, and in part satisfaction for the same, the commissioners of the United States, in behalf of said States, do hereby cede to said nation a tract of country west of the Mississippi River situate between the Arkansas and Red Rivers, and bounded as follows: Beginning on the Arkansas River, where the lower boundary line of the Cherokees strikes the same; thence up the Arkansas to the Canadian Fork, and up the same *to its source;* thence *due south to the Red River;* thence down Red River, three miles below the mouth of Little River, which empties itself into Red River on the north side; thence a direct line to the beginning." 7 Stat. 210, 211.

Those who supervised the drawing of the treaty of 1820 evidently did not closely scrutinize the provisions of the treaty with Spain signed the year previous; for the line "up the same [Canadian Fork] to its source, thence due south to the Red River" was in conflict with the Spanish treaty of 1819 which fixed the dividing line, running north and south, between the United States and Spain on the 100th degree of west longitude. This is clear from the use of the words in the Choctaw treaty of 1820, "up the Arkansas to the Canadian Fork, and up the same to its source, thence due south to the Red River." Or, perhaps, those who drew the treaty of 1820 assumed without inquiry that the source of the Canadian River was not farther west than the 100th degree of west longitude, which the treaty of 1819 designated as the dividing line between the United States and Spain. As the westernmost point of the Canadian River or Fork is 105° west, and the westernmost point of Red River is about 103° 10′ west longitude, a line running up the Canadian Fork "to its source, thence due south to Red River," was an impossible line; for necessarily a line directly south from the actual source of the Canadian River would never strike Red River; while a line drawn from the actual source of the Canadian River to the westernmost point of Red River would cross

the Canadian River several times, striking Red River about longitude 103° 10' west.

The difficulties arising from the conflicting description of boundaries as given in the Quapaw, Spanish and Choctaw treaties, above referred to, seem to have been recognized when the United States and the Choctaws, in execution, or in further recognition, of the treaty of 1820, made another treaty on the 27th of September, 1830. 7 Stat. 333, 334.

By the latter treaty it was provided:

"ART. 2. The United States, under a grant specially to be made by the President of the United States, shall cause to be conveyed to the Choctaw Nation a tract of country west of the Mississippi River, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it; beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian Fork, *if in the limits of the United States, or to those limits;* thence *due* south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning. The boundary of the same to be agreeably to the treaty made and concluded at Washington City in the year 1825. The grant to be executed so soon as the present treaty shall be ratified.

"ART. 3. In consideration of the provisions contained in the several articles of this treaty, the Choctaw Nation of Indians consent and hereby cede to the United States the entire country they own and possess east of the Mississippi River; and they agree to remove beyond the Mississippi River as early as practicable, and will so arrange their removal that as many as possible of their people, not exceeding one half of the whole number, shall depart during the falls of 1831 and 1832; the residue to follow during the succeding fall of 1833; a better opportunity in this manner will be afforded the Government to extend to them the facilities and comforts which it is desirable should be extended in conveying them to their new homes.

"ART. 4. The Government and people of the United States are hereby obliged to secure to the said Choctaw Nation of Red People the jurisdiction and government of all the persons and

property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants; and that no part of the land granted them shall ever be embraced in any Territory or State; but the United States shall forever secure said Choctaw Nation from and against all laws except such as from time to time may be enacted in their own national councils, not inconsistent with the Constitution, treaties and laws of the United States; and except such as may and which have been enacted by Congress, to the extent that Congress under the Constitution are required to exercise a legislation over Indian affairs. But the Choctaws, should this treaty be ratified, express a wish that Congress may grant to the Choctaws the right of punishing, by their own laws, any white man who shall come into their nation and infringe any of their national regulations." 7 Stat. 333, 334.

It cannot be doubted that the purpose of Article 2 of the treaty of 1830 was to provide for a special grant to the Choctaws of the lands intended to be ceded to them by Article 2 of the treaty of 1820, and no others. It was as if the parties declared that the words in the treaty of 1820, " thence up the Arkansas to the Canadian Fork, and up the same to its source, thence due south to the Red River," should be held to mean the same as the words in the treaty of 1830, " thence to the source of the Canadian Fork, *if* in the limits of the United States, *or to those limits, thence* due south to Red River." The treaty of 1830 plainly imports the understanding of the parties at that time that whatever might be the wording of the treaty of 1820, the United States had not thereby intended to grant, and the Choctaws had not thereby expected to receive, any lands at or near the source of the Canadian Fork unless that point was within the limits of the United States — that both parties had in view at that time only lands within the limits of the United States.

As the treaty of 1820 provided that the Choctaws should have lands as far west as the source of the Canadian River, it is suggested that the United States could not legally modify that provision by the subsequent ratification in 1821 of the

treaty with Spain signed in 1819.   But it was entirely compe-
tent for the parties, without any new or valuable consideration
intervening, to rectify a mistake in the description of bound-
aries, and to agree, as in effect they did by the treaty of 1830,
that the words " to the Canadian Fork, and up the same to its
source," in the treaty of 1820, were to be interpreted as mean-
ing " to the source of the Canadian Fork, if in the limits of the
United States, or to those limits "—thus relieving the United
States from any obligation to make a special grant to the Choc-
taws of lands which by the treaty with Spain, ratified in 1821,
had been recognized as part of Spanish territory.   After the
treaty of 1830 the line " thence due south to the Red River"
was to be taken as running from a point on the dividing line
between the United States and Spain, the 100th degree of west
longitude as established by the treaty of 1819–1821, *thence due
south* to that river.

In confirmation of the view we have taken of the treaty of
1830, we may refer to the agreement made January 17, 1837,
by which the Choctaws assented to the formation by the Chick-
asaws of a district " within the limits of *their country*."   11 Stat.
563.   In the description of the boundaries of that district, which
adjoins the district of the Choctaws on the west, it appears that
one of the lines ran to a point ten or twelve miles above the
mouth of the south fork of the Canadian River, " thence west
along the main Canadian River to its source, *if* in the limits of
the United States, *or to those limits ;* and thence, due south to
Red River, and down Red River to the beginning."   Here was
a repetition of the words of the treaty of 1830 and a distinct
recognition of the fact that the Choctaw country was not to be
regarded as embracing any lands not then, in 1837, within the
limits of the United States.   It cannot be contended that any
lands west of the 100th degree of west longitude were within
such limits as then established.

It is an important fact in this connection that prior to the
treaty of 1830 the United States of America and the United
Mexican States, by the treaty between them of January 12,
1828, recognized the boundaries of the respective countries to
be as fixed by the treaty of 1819–1821.   8 Stat. 372, 374.   And

this position was maintained; for by a treaty concluded in 1838 between the United States and the Republic of Texas, the latter recognized as binding upon it the treaty made in 1828 with the United Mexican States. Treaties and Conventions, (1776–1887) p. 1079. And in the settlement made in 1850 between the United States and the State of Texas the latter agreed that its boundary on the north should commence at the point at which *the meridian of* 100 *degrees west* from Greenwich is intersected by the parallel of 36° 30' north latitude, and run from that point west to the meridian 103 degrees west from Greenwich, then due south to the 32d degree of north latitude, thence on that parallel to the Rio Bravo del Norte, and thence with the channel of that river to the Gulf of Mexico. 9 Stat. 446, c. 49; *United States* v. *Texas,* 162 U. S. 1, 39.

It is said that the United States made a gift to Texas of the lands west of the 100th degree of west longitude, but that it could not give away lands previously ceded by the treaty of 1820 to the Choctaws. We have already shown that the United States and the Choctaws substantially stipulated in the treaty of 1830 that the lands to be transferred to the Choctaws in consideration of the transfer by the Choctaws of lands east of the Mississippi River were only such as were within the limits of the United States. But we add, as a fact of significance, that in 1842 the special grant provided for by the treaty of 1830 to be made to the Choctaws described one of the lines of the lands granted to those Indians as " running thence to the source of the Canadian Fork, *if in the limits of the United States, or to those limits,* thence due south to the Red River." This grant was accepted by the Choctaws, and we find no evidence in the record tending to show that they at that time or at any time prior thereto claimed that the United States was under any obligation to transfer to them, or to compensate them for any lands west of the 100th degree of west longitude which the United States had recognized to be within the limits of Spain. There is no suggestion even in the petition in this case that the treaty of 1830 did not properly express the intention of the parties as to the lands to be transferred to the Choctaws.

II. Proceeding in our examination of the facts supposed to

throw light upon the meaning of the treaty of 1866, we find that in 1854, for the first time, the Choctaws, acting under some influence not explained by the record, insisted that their country extended west of the 100th degree of west longitude.   In a letter dated July 11, 1854, and addressed to the Commissioner of Indian Affairs by Choctaw delegates, it was said: ". . . We shall therefore have to demand the immediate removal of the several bands of Texas and other Indians, who have settled within our limits; and if this demand be not complied with, we will remove them ourselves, using force if necessary.   The Government must look to the consequences, whatever they may be.   Our country extends west *to the headwaters of the Canadian, about the* 103*d degree of west longitude,* and we are prepared to maintain our rights to a boundary that far west by facts and evidence which cannot be disputed.   In the compromise with Texas in 1850 that portion of our country west of the 100th degree of west longitude was assigned to that State, in direct and palpable violation of our rights.   We must demand to be repossessed of this portion of our country; and if this is not done our people will take possession of it, and leave the Government to settle with Texas and the Indians upon it for such damages as they claim."

Under date of April 9, 1855, the United States agent for the Choctaws, acting under instructions from the Commissioner of Indian Affairs, asked the Choctaw delegates, then in Washington, for a conference—submitting to them certain interrogatories to be answered in writing—"for the purpose of ascertaining what arrangements, if any, can be made with them, having in view the adjustment of all differences between their tribe and the Chickasaw tribe of Indians, the Government of the United States, and the permanent settlement of the Wichita and other bands of Indians in the Choctaw country."

The Choctaw delegates, in reply, said among other things: " Respecting the Wichita and other bands of Indians, who have intruded themselves within the limits of our country, we have to remark they are, as you know, a nuisance, and we had far rather be rid of them altogether.   In our communication to the acting Commissioner of Indian Affairs of the 11th of July

last, we demanded their removal as we had a right to do; but we are not aware that any order has been given on the subject. We have had it in contemplation to renew this demand, and if not complied with to remove them by force if necessary. We and our people have, however, as we have ever had, every disposition to comply with the policy and wishes of the Government; and if it be an object of importance to it to have these Indians accommodated with a home within the boundaries of our country, though such an arrangement would be greatly repugnant to our inclinations and feelings, we would consent to it on fair and reasonable terms, if it can be made a part of a just and equitable adjustment of all the matters involved in the existing controversy between the Choctaws and the Government; otherwise we could not take the serious responsibility of encountering the prejudices and opposition of our people to the measure."

The Chickasaw delegates, with whom a conference was also sought, said, under date of April 14, 1855: " In regard to the third point, they have only to say that, in conjunction with the Choctaws, they are willing to enter into an arrangement with the United States Government for the permanent settlement of the Wichita and other bands of Indians in the Choctaw country, upon terms just, fair and safe for both the Choctaws and Chickasaws."

Under date of April 21, 1855, the Secretary of the Interior wrote to the Commissioner of Indian Affairs: " If you have any plan for settlement of these difficulties, or if the Choctaws will submit a distinct offer, as the terms on which they will settle with the Chickasaws, and provide for the Wichitas and other Indians within the limits of the Choctaw country, the Department will give it prompt consideration, and with every disposition to award to them and the Chickasaws such degree of favor as may not be incompatible with the rights and interests of the United States."

On the 24th of April, 1855, the Choctaw delegates wrote to the Indian agent: " 2. We will agree to provide, in the same convention or supplemental treaty, that the Government shall have the permanent use of a limited portion of the western

part of our country, for the accommodation of the Wichita and other bands of Indians, for a fair and just consideration, the amount to depend, of course, upon the extent of country required for the purpose. The Commissioner of Indian Affairs, in his letter, requires you to ascertain our terms for the use of that portion of our country west of the 98th degree of west longitude, and also for that west of the 99th degree. We are unwilling to lease, for the purpose mentioned, any portion of our country east of the 99th degree; but for the lease of that west of that degree we will consent, in behalf of our people, to take the sum of $400,000."

Two days later, April 26, 1855, the Commissioner of Indian Affairs thus wrote to the Indian agent: ". . . You will also ascertain upon what terms the Choctaws will arrange with the United States, for the use of their country west of 98° west longitude, for the Wichitas and such other bands of Indians as the Government may desire to settle permanently west of that degree of longitude, also upon what terms the right to settle said Indians west of 99° west longitude can be obtained, and report to this office with the least delay possible."

On the day last named the Indian agent sent a letter to the Commissioner, enclosing "a proposition for the lease of the Choctaw possessions west of the 99th degree of west longitude to the Government, for the permanent settlement of the Wichita and other bands of Indians within the Choctaw country."

Under date of April 27, 1855, the Secretary of the Interior wrote to the Commissioner of Indian Affairs: "As I have heretofore said, I have every disposition to act towards these Indians in a spirit of the utmost liberality consistent with the just rights and interests of the United States; and, all things considered, am disposed to think the proposition for the permanent accommodation of the Wichita and other Indians, and the amount demanded therefor, worthy your consideration; and you are authorized to enter into negotiations with the Choctaws on that basis. I think, however, that, notwithstanding their claim to an extent of country west of the 100th meridian of longitude is regarded by the Department as without any foundation in law or equity, *it might prevent further trou-*

*ble, in regard to it, to insert an article in the supplemental treaty or convention, now to be held, requiring the Choctaws to relinquish and abandon all right or claim to the same."*

Under date of May 2, 1855, the Indian agent wrote to the Choctaw delegates : " In view of the probability that an arrangement will be effected between the Choctaw and Chickasaw tribes, restricting the western boundary of the ' Chickasaw district' to the 98° of west longitude, west from Greenwich, I desire to ascertain whether you will agree, the Chickasaws assenting, to *lease* the country between 98° and 100° west longitude and between Red and Canadian Rivers to the United States, for the permanent settlement of the Wichita and other bands of Indians within the territorial limits of the Choctaw Nation ; and if so, upon what terms, *it being understood that the Choctaws shall relinquish and quitclaim, in favor of the United States, whatever interest they may have in the country lying west of the 100° of west longitude.*"

On the 3d of May, 1855, the Choctaw delegates wrote to the Indian agent : " In our communication to you of the 9th ultimo, we referred to the prejudices and opposition of our people to the location of the Indians referred to within the limits of our country, and our repugnance to such an arrangement ; but we stated that we had every disposition to comply with the policy and wishes of the Government on the subject ; and that, if the measure were one of importance to it, we would take the responsibility and consent to it, on fair and reasonable terms.    In our subsequent communication of the 24th instant, we stated our unwillingness to lease, for that purpose, any portion of our country east of the 99° of west longitude, but that we would agree to lease that west of that degree, for the sum of four hundred thousand dollars.    On further consideration of the subject, however, since the receipt of your letter, we have concluded, in the same spirit of accommodation, to agree to comply with the wishes of the Government by leasing to it the further portion of our country between the 98° and 100° of west longitude.    The question of the total relinquishment of any portion of our territorial rights is one of even greater delicacy and difficulty.    We have fully acquainted you with the grounds of our

claim to title *to the headwaters of the Canadian River, extending as far west as at least to the 103° of west longitude.* .We believe our title to be perfectly valid and good; but as it is questioned, if not disputed, by the Government, west of the 100° of west longitude, and we are anxious to put at rest all questions of controversy with it, *we will relinquish and quitclaim to it our rights west of that degree of longitude, on fair and equitable terms.* The extent of country involved is large; we know it to be valuable, and we believe the acquisition of our title to it to be important to the Government; still we have no disposition to be exorbitant. As a consideration for the whole arrangement, we would consent to take eight hundred thousand dollars—one half thereof for the lease of the country between the 98° and 100° west longitude, and the other half for the relinquishment of our right west of the latter degree. The above proposition has reference to the arrangement as a whole. Were it to be confined only to the lease of the portion of the country between the two degrees of longitude mentioned, we should for obvious reasons feel constrained to ask not less than six hundred thousand dollars therefor."

On May 4, 1855, the Indian agent wrote to the Choctaw delegates: "If the Choctaws will propose to lease to the United States the territory west of 98° and east of 100° west longitude, (the Chickasaws assenting,) and couple with it a relinquishment of all claims west of 100° west longitude, the Government will agree to pay them $600,000."

Under date of June 7, 1855, the Commissioner of Indian Affairs wrote to the Acting Secretary of the Interior: ". . . After consultation with the Secretary of the Interior, and with his concurrence, Agent Cooper was instructed, verbally, to inform the delegation that if they would accept the sum of $600,000 for the lease of the country between the two degrees, *and the relinquishment west of the* 100°, the Government would give that sum. The delegation assented to this proposition, and agreed to take the sum of $600,000 for the lease of the territory within the two degrees mentioned, and the relinquishment of their claims to the country west of the 100th degree. The Chickasaw delegation also assented and agreed to the terms of

the lease, and the question was settled, as I supposed; but both delegations now contend that the United States shall be restricted, in the number of bands of Indians to be located in the country leased, to such as are now residing in it. With such a limitation on the use of the country, the lease would be of little value, and I have, therefore, declined to assent to the limitation which the Indians desire to impose, and have claimed that the Government must be left free to locate such Indians as it may desire within the ceded country. . . . The delegations propose, as a compromise, *that the Choctaws quitclaim to the country west of* 100°, and that they and the Chickasaws will *lease the country between* 99° *and* 100° for the permanent settlement of any Indians whom the Government may desire to locate therein, for the sum of $600,000."

Under date of June 14, 1855, the Choctaw delegates thus addressed the Commissioner of Indian Affairs: "The lease we had consented to agree to was a limited one, viz., for the permanent settlement, within the country leased, of the Wichita and several alien tribes and bands now in our country, the Government to have the control of them, but we still to retain jurisdiction over the country itself, with the right of settlement therein by Choctaws and Chickasaws as heretofore, as expressed and provided for in the convention. If the Government had the unrestricted right to bring in any and all Indians it pleased, the whole district might soon be filled up with a discordant, restless and predatory population, which would endanger the frontier settlements of the Choctaws and Chickasaws, deprive us practically of our jurisdiction and necessarily exclude Choctaws and Chickasaws from settling within the district, if they so desired. Such an arrangement would be a virtual sale of that portion of our country, to which we could under no circumstances submit. Moreover the consideration offered would be entirely inadequate. We had agreed to relinquish our claims to territory west of the 100° of west longitude, embracing at least six and a half millions of acres. The district desired to be leased contains quite seven millions more; so that practically the Government would have acquired from us some thirteen and a half

millions of acres of land, for the certainly insufficient sum of six hundred thousand dollars."

We have made this extended reference to the correspondence between the Indians and the officers of the United States for the purpose, not only of showing that the Choctaws had no claim, legal or equitable, to territory west of the 100th degree of west longitude, but of indicating the situation and relations of the parties when the treaty of 1855, to be presently referred to, was concluded.

The facts, above stated, so far as they relate to lands west of the 100th degree of west longitude, may be thus summarized :

1. By the treaty of 1818 two of the boundary lines of the tract of country ceded by the Quapaws to the United States were described as extending " up the Arkansaw to the Canadian Fork, and up the Canadian Fork to its source ; thence south to Big Red River."

2. By the treaty signed in 1819, the dividing line between the United States and Spain, running north from Red River, was established on the *100th* degree of west longitude.

3. In 1820, before the treaty of 1819 was ratified, the United States made a treaty with the Choctaw Nation ceding certain territory, two of the lines of which were described by the treaty of 1820 as extending " up the Arkansas to the Canadian Fork, and up the same *to its source* ; thence due south to the Red River." But those were impossible lines, because the source of the Canadian River or Fork was at the 105th degree of west longitude, while the source of Red River was at the 103d degree of west longitude, and a line running due south from the source of the Canadian River would not strike Red River.

4. When the treaty of 1830 was made with the Choctaws the fact was recognized that the United States had apparently ceded to the Choctaws lands west of the 100th degree of west longitude, which by the previous treaty with Spain signed in 1819 and ratified in 1821 had been recognized as within Spanish territory. But that the United States might not appear to cede or agree to cede lands outside of its limits, the treaty of 1830 corrected or qualified the description in the treaty of 1820 of the line running up the Canadian Fork to its source by using

the words "if in the limits of the United States, or to those limits; thence due south to Red River." This change in the wording of the treaty of 1820 was recognized by the agreement between the Choctaws and Chickasaws of 1837, and was confirmed by the Choctaws when they accepted the special grant executed in 1842.

5. It does not appear that the Choctaws made any claim between 1830 and 1854 to have derived by cession from the United States any title to lands west of the dividing line between the United States and Spain, that is, west of the 100th degree of west longitude, or that the Choctaws complained during that period that any lands ceded to them by the treaty of 1820 were wrongfully or illegally recognized by the treaty of 1819 as belonging to Spain.

6. In 1854–'5 the Choctaws, for the first time, asserted title to lands west of the 100th degree of west longitude as far west at least as the 103d degree. This claim was disputed by the United States, and pronounced by the Secretary of the Interior to be wholly without any foundation in law or equity, although that officer deemed it wise that the new treaty then (1855) contemplated to be made should embrace a relinquishment by the Choctaws to the United States of any interest they might have in lands west of the 100th degree of west longitude.

7. The Choctaws expressed their willingness to make a treaty leasing to the United States certain territory in their country east of the 100th degree of west longitude, *and* relinquishing any and all claim to lands west of that degree.

III. Such was the situation when the parties entered upon negotiations resulting in another treaty. We allude to the treaty of June 22, 1855, upon some of the provisions of which much stress has been placed by the parties.

The preamble to that treaty recites:

"Whereas the political connection, heretofore existing between the Choctaw and Chickasaw tribes of Indians, has given rise to unhappy and injurious dissensions and controversies among them, which render necessary a readjustment of their relations to each other and to the United States; and whereas the United States desire that the Choctaw Indians *shall relin-*

*quish all claim to any territory west of the* 100*th degree of west longitude,* and also to make provision for the permanent settlement, within the Choctaw country, of the Wichita and certain other tribes or bands of Indians, for which purpose the Choctaws and Chickasaws are willing to *lease,* on reasonable terms, to the United States that portion of their common territory which is west of the 98th degree of west longitude [that is, the territory between the 98th and 100th degree of west longitude]; and whereas the Choctaws contend that by a just and fair construction of the treaty of September 27, 1830, they are of right entitled to the net proceeds of the lands ceded· by them to the United States, under said treaty, and have proposed that the question of their right to the same, together with the whole subject-matter of their unsettled claims, whether national or individual, against the United States, arising under the various provisions of said treaty, shall be referred to the Senate of the United States for final adjudication and adjustment; and whereas it is necessary, for the simplification and better understanding of the relations between the United States and the Choctaw Indians, that all their subsisting treaty stipulations be embodied in one comprehensive instrument. Now, therefore," etc.

The boundaries of "the Choctaw and Chickasaw country," as established by Article 1 of this treaty, were as follows: "Beginning at a point on the Arkansas River, one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running thence due south to Red River; thence up Red River to the point *where the meridian of one hundred degrees west longitude crosses the same; thence north along said meridian, to the main Canadian River;* thence down said river to its junction with the Arkansas River; thence down said river to the place of beginning;" and pursuant to the act of Congress approved May 28, 1830, 4 Stat. 411, c. 148, the United States forever secured and guaranteed the lands embraced within those limits to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common, so that each and every member of either tribe should have an equal and undivided interest in the whole, subject, however, to the condition that no part thereof

should ever be sold without the consent of both tribes; and that the land should revert to the United States if the Indians and their heirs became extinct, or abandoned the same.

It will be observed that " the Choctaw and Chickasaw country," as thus established, embraced no lands west of the 100th degree of west longitude.

Article 2 of the treaty established the boundary of the Chickasaw district—the district marked on the diagram heretofore made part of this opinion as tract 3.

By Article 3 it was provided that "the remainder of the country held in common by the Choctaws and Chickasaws shall constitute the Choctaw district, and their officers and people shall at all times have the right of safe conduct and free passage through the Chickasaw district." This territory is designated on the diagram as tract 2.

Article 4 provided that the government and laws then in operation, and not inconsistent with the treaty, should remain in full force within the limits of the Chickasaw district, until the Chickasaws should adopt a constitution.

Article 5 secured to the members of either tribe the right freely to settle within the jurisdiction of the other, and have all the rights, privileges and immunities of citizens thereof, except that no member of either tribe should participate in the funds belonging to the other tribe.

Article 6 provided for the surrender of fugitives from the justice of either tribe.

Article 7 secured to each tribe the unrestricted right of self-government, and, with certain exceptions not necessary to be here stated, full jurisdiction over persons and property within their respective limits.

Article 8 provided that in consideration of the foregoing stipulations, and immediately upon the ratification of the treaty, there should be paid to the Choctaws, in such manner as their national council should direct, out of the national fund of the Chickasaws held in trust by the United States, the sum of $150,000.

Articles 9 and 10 are the important parts of the treaty of

1855 so far as the present litigation is concerned.   We there-
fore give them here in full:

"ART. 9.  The Choctaw Indians do *hereby absolutely and for-
ever quitclaim and relinquish* to the United States *all* their
right, title and interest in and to any and *all lands west of the*
100th *degree of west longitude;* and the Choctaws and Chick-
asaws do hereby *lease* to the United States all that portion of
their common territory west of the 98th degree of west longi-
tude, for the *permanent settlement* of the Wichita and such other
tribes or bands of Indians as the Government may desire to locate
therein; excluding, however, all the Indians of New Mexico,
and also those whose usual ranges at present are north of the
Arkansas River, and whose permanent locations are north of
the Canadian River, but including those bands whose permanent
ranges are south of the Canadian, or between it and the Arkan-
sas; which Indians shall be subject to the exclusive control of
the United States, under such rules and regulations, not incon-
sistent with the rights and interests of the Choctaws and Chick-
asaws, as may from time to time be prescribed by the President
for their government; *Provided, however,* the territory so leased
shall remain open to settlement by Choctaws and Chickasaws
as heretofore.

"ART. 10. *In consideration* of the foregoing relinquishment
*and* lease, and as soon as practicable after the ratification of this
convention, the United States will pay to the Choctaws the sum
of six hundred thousand dollars, and to the Chickasaws the sum
of two hundred thousand dollars, in such manner as their general
councils shall respectively direct."   11 Stat. 611, 612, 613.

The treaty of 1855 contains other articles, but they do not
affect the determination of the present issues, and therefore we
need not advert to them.

The lands described in this treaty as having been leased to
the United States constituted what is called the "Leased Dis-
trict," no part of which, as we have seen, was west of the 100th
degree of west longitude.

There can be no doubt as to the meaning and scope of the
treaty of 1855.   In order simply to avoid future dispute, the
United States desired the relinquishment by the Choctaw Nation

of all claim to any territory west of the 100th degree of west longitude, and, in addition, it obtained a lease of the territory between the 98th and 100th degrees of west longitude for the permanent settlement of the Wichita and certain other tribes or bands of Indians, the right being reserved to the Choctaws and Chickasaws to settle on the leased territory as theretofore. The consideration for the " relinquishment *and* lease " was $800,000. It is immaterial to inquire as to the value placed by the Indians or by the United States upon the relinquishment and lease respectively. The Indians accepted for both the aggregate amount named. It is idle therefore to contend that the Indians had any claim upon the United States, after the treaty of 1855, for lands west of the 100th degree of west longitude. The treaty closed that dispute forever, if it had not been closed by previous treaties and by the special grant of 1842 made pursuant to Article 2 of the treaty of 1830, and which, as we have said, estopped the Indians from claiming any lands not within the limits of the United States. As to the lands the control of which was acquired by the lease embodied in the treaty of 1855, it may be assumed that the United States did not then desire to obtain the fee, but took the lands for specifically defined objects, upon the accomplishment of which the Indians could insist as a condition of the lease.

After the treaty of 1855 it was not possible for the Choctaws to assert any claim to lands west of the 100th degree of west longitude, and as to the lands between that and the 98th degree of west longitude, the United States held them under a permanent lease given in 1855, which practically divested the Choctaws of all interest in the territory constituting the Leased District, except that they could settle in it if they so desired.

IV. Subsequently to the making of the treaty of 1855, and until the Civil War intervened, the relations between the United States and these Indians were, so far as the record discloses, entirely harmonious. But their relations changed when that war opened and the Choctaws and Chickasaws coöperated with the Confederate forces, making war upon Indians adhering to the United States. As early as February 7, 1861, the General Council of the Choctaw Nation passed resolutions declaring that

in the event of a permanent dissolution of the Union the natural affections, education, institutions and interests of its people indissolubly bound them to the Confederate States; Reb. Rec. Series I, Vol. 1, p. 682; and on the 25th of May, 1861, the legislature of the Chickasaws passed resolutions declaring that in the war then opening the Confederate States were their natural allies, and called upon the neighboring Indian nations to coöperate with them in the defence of the territory they inhabited "from Northern invasion by the Lincoln hordes and Kansas robbers." Reb. Rec. Series I, Vol. 3, p. 585.

The Civil War having ended, a council was held in September, 1865, at Fort Smith, Arkansas, which was attended by D. N. Cooley, Commissioner of Indian Affairs, and others named by the President. There were also in attendance representatives of the Choctaws, Chickasaws, Creeks, Cherokees, Seminoles, Osages, Senecas, Shawnees, Quapaws, Wyandottes, Wichitas and Comanches. What was said at that meeting by the commissioners on behalf of the United States is supposed to have some bearing upon the present issues. An address was made by Chairman Cooley to the Indian delegates, the substance of which was printed in a newspaper, and was as follows:

"Brothers: After considering your speeches made yesterday the commissioners have decided to make the following reply and statement of the policy of the Government. Brothers: We are instructed by the President to negotiate a treaty or treaties with any or all of the nations, tribes or bands of Indians in the Indian Territory, Kansas or of the plains west of the Indian Territory and Kansas. The following-named nations and tribes have by their own acts, by making treaties with the enemies of the United States, at the dates hereafter named, forfeited all right to annuities, lands and protection by the United States. The different nations and tribes having made treaties with the rebel government are as follows, viz.: The Creek Nation, July 10, 1861; Choctaws and Chickasaws, July 12, 1861; Seminoles, August 1, 1861; Shawnees, Delawares, Wichitas and affiliated tribes residing in leased territory, August 12, 1861; the Comanches of the Prairie, August 12, 1861; the Great Osages, October 2, 1861; the Senecas, Senecas and Shawnees

(Neosho Agency), October 4, 1861 ; the Quapaws, October 4, 1861; the Cherokees, October 7, 1861. By these nations having entered into treaties with the so-called Confederate States, and the rebellion being now ended, they are left without any treaty whatever, or treaty obligation for protection by the United States.

"Under the terms of the treaties with the United States and the law of Congress of July 5, 1862, all these nations and tribes forfeited and lost all their rights to annuities and lands. The President, however, does not desire to take advantage of or enforce the penalties for the unwise actions of these nations. The President is anxious to renew the relations which existed at the breaking out of the rebellion. We, as representatives of the President, are empowered to enter into new treaties with the proper delegates of the tribes located within the so-called Indian Territory and others above named living west and north of the Indian Territory. Such treaties must contain substantially the following stipulations : 1. Each tribe must enter into a treaty for permanent peace and amity with themselves, each nation and tribe, and with the United States. 2. Those settled in the Indian Territory must bind themselves, when called upon by the Government, to aid in compelling the Indians of the plains to maintain peaceful relations with each other, with the Indians in the Territory, and with the United States. 3. The institution of ·slavery, which has existed among several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for. 4. A stipulation in the treaties that slavery or involuntary servitude shall never exist in the tribe or nation except in punishment of crime. 5. A portion of the lands hitherto owned and occupied by you must be set apart for the friendly tribes now in Kansas and elsewhere, on such terms as may be agreed upon by the parties and approved by the Government, or such as may be fixed by the Government. 6. It is the policy of the Government, unless other arrangements be made, that all the nations and tribes in the Indian Territory be formed into one consolidated govern-

ment, after the plan proposed by the Senate of the United States in a bill for organizing the Indian Territory. 7. No white person except officers, agents and employés of the Government, or of any internal improvement authorized by the Government, will be permitted to reside in the Territory unless formally incorporated with some tribe according to the usages of the band.

"Brothers: You have now heard and understand what are the views and wishes of the President, and the commissioners, as they told you yesterday, will expect definite answers from each of you upon the questions submitted. As we said yesterday, we say again, that in any event those who have always been loyal, although their nations may have gone over to the enemy, will be liberally provided for and dealt with."

The committee on the part of the Choctaws and Chickasaws, in reply to the proposition submitted by the commissioners of the United States as the basis of new treaties, said:

"We are pleased to learn that you propose to renew your previous relations with us, and we are willing to go into negotiations for the making of a new treaty with the United States, and as a basis of this new treaty accept articles 1st and 7th. In reference to the requirements of the article 2d, we desire to say that we wish as far as possible to avoid coming in conflict with our red brethren, should any of them be so unfortunate as to get into conflict with the United States authorities. We are willing to guarantee all our influence in favor of peace in all its bearings with our red brethren, and will not object to any of our citizens volunteering in any war in which the United States may become involved, for the aiding of the United States. We are willing to enter into negotiations for the settlement of all the points contained in the 3d and 4th articles. On certain terms, on which we can doubtless agree with you, we are willing to admit the settlement of other tribes within our territory, as proposed in the 5th article. We are willing to submit the territorial bill referred to in the 6th article for the consideration of our respective general councils, and for this purpose request a copy of that bill for the principal chief of the Choctaw Nation and for the governor of the Chickasaw

Nation. We accept article 7th, and are willing to have the provisions thereof incorporated into the treaty. We are also willing to incorporate a provision that no individual shall be proscribed, or any act of forfeiture or confiscation passed against those who remain friendly to the United States, and that they shall enjoy equal privileges with other members of the nation."

Among the documents in the record is a draft of a treaty between the United States and the Choctaw and Chickasaw tribes which, it was stated, was submitted by the United States commissioners at the council held at Fort Smith. It is said in the opinion of the Court of Claims—and we think correctly—that this treaty was never agreed upon or executed. It need not therefore be set out here.

The reports, official and unofficial, of what was said and done before and at the Fort Smith council, show that the persons in attendance there were aware of the exact situation. They separated with the expectation or understanding that the matters then under consideration were to be further discussed and a conclusion reached in Washington in the spring of 1866, at which place delegates from the Indian tribes would attend.

In 1866 the negotiations between the United States and the Choctaw and Chickasaw Nations were resumed at Washington. The result was the treaty concluded April 28, 1866. 14 Stat. 769. The respective rights of the Choctaws and Chickasaws and of the United States, as involved in the present case, depend upon the construction of that treaty.

It is to be taken as beyond dispute that when the parties entered upon the negotiations resulting in that treaty, neither overlooked the fact that the Choctaws, by the treaty of 1855, had forever quitclaimed any claim they had to territory west of the 100th degree of west longitude. Nor could either have forgotten that the United States had, by the same treaty, acquired the control of the Leased District, without limit as to time, for the permanent settlement of certain Indians, excluding other Indians. Bearing these facts in mind, let us see what was effected by the treaty of 1866.

By Article 1, permanent peace and friendship were established between the United States and those nations—the Choctaws and

Chickasaws binding themselves respectively to use their influence and to make every exertion to induce Indians of the plains to maintain peaceful relations with each other, with other Indians, and with the United States.

By Article 2, the Choctaws and Chickasaws covenanted and agreed that neither slavery nor involuntary servitude, otherwise than in punishment of crime whereof the parties had been duly convicted in accordance with laws applicable to all members of the particular nation, should ever exist in those nations.

Article 3—the important part of that treaty—was in these words: "The Choctaws and the Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby *cede* to the United States *the territory west of the 98° of west longitude, known as the Leased District,* provided that the said *sum* shall be invested and held by the United States, at an interest not less that five per cent, *in trust* for the said nations, until the legislatures of the Choctaw and Chickasaw Nations respectively shall have made such laws, rules and regulations as may be necessary to give all persons of African descent resident in the said nations at the date of the treaty of Fort Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges and immunities, including the right of suffrage, of citizens of said nations, except in the annuities, moneys and public domain claimed by, or belonging to, said nations respectively; and also to give to such persons who were residents as aforesaid, and their descendants, forty acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said land, after the Choctaws and Chickasaws and Kansas Indians have made their selections as herein provided; and immediately on the enactment of such laws, rules and regulations, the said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw Nations in the proportion of three fourths to the former and one fourth to the latter—less such sum, at the rate of one hundred dollars per capita, as shall be sufficient to pay such persons of African descent before referred to as within ninety days after the passage of such laws, rules and regulations shall elect to remove and actually remove from the said nations respec-

tively. And should the said laws, rules and regulations not be made by the legislatures of said nations respectively, within two years from the ratification of this treaty, then the said sum of three hundred thousand dollars shall cease to be held in trust for the said Choctaw and Chickasaw Nations, and be held for the use and benefit of such of said persons of African descent as the United States shall remove from said territory in such manner as the United States shall deem proper—the United States agreeing, within ninety days from the expiration of the said two years, to remove from said nations all such persons of African descent as may be willing to remove, those remaining or returning after having been removed from said nations to have no benefit of said sum of three hundred thousand dollars or any part thereof, but shall be upon the same footing as other citizens of the United States in the said nations."

The Choctaws and Chickasaws further agreed in the same treaty (Art. 4) that " all negroes not otherwise disqualified or disabled shall be competent witnesses in all civil and criminal suits and proceedings in the Choctaw and Chickasaw courts, any law to the contrary notwithstanding; and they fully recognize the right of the freedmen to a fair renumeration on reasonable and equitable contracts for their labor, which the law should aid them to enforce. And they agree, on the part of their respective nations, that all laws shall be equal in their operation upon the Choctaws, Chickasaws and negroes, and that no distinction affecting the latter shall at any time be made, and that they shall be treated with kindness and be protected against injury; and they further agree that while the said freedmen, now in the Choctaw and Chickasaw Nations, remain in said nations, respectively, they shall be entitled to as much land as they may cultivate for the support of themselves and families, in cases where they do not support themselves and families by hiring, not interfering with existing improvements without the consent of the occupant, it being understood that in the event of the making of the laws, rules and regulations aforesaid the forty acres aforesaid shall stand in place of the land cultivated as last aforesaid."

By Articles 30 and 43 it was provided:

" ART. 30. The Choctaw and Chickasaw Nations will receive into their respective districts *east* of the 98th degree of west longitude, in the proportion of one fourth in the Chickasaw and three fourths in the Choctaw Nation, civilized Indians from the tribes known by the general name of the Kansas Indians, being Indians to the north of the Indian Territory, not exceeding ten thousand in number, who shall have in the Choctaw and Chickasaw Nations, respectively, the same rights as the Choctaws and Chickasaws, of whom they shall be the fellow citizens, governed by the same laws, and enjoying the same privileges, with the exception of the right to participate in the Choctaw and Chickasaw annuities and other moneys, and in the public domain, should the same or the proceeds thereof be divided per capita among said Choctaws and Chickasaws, and among others the right to select land as herein provided for Choctaws and Chickasaws, after the expiration of the ninety days during which the selections of land are to be made as aforesaid by said Choctaws and Chickasaws; and the Choctaw and Chickasaw Nations pledge themselves to treat the said Kansas Indians in all respects with kindness and forbearance, aiding them in good faith to establish themselves in their new homes, and to respect all their customs and usages not inconsistent with the constitution and laws of the Choctaw and Chickasaw Nations respectively. In making selections after the advent of the Indians and the actual occupancy of land in said nation, such occupancy shall have the same effect in their behalf as the occupancies of Choctaws and Chickasaws; and after the said Choctaws and Chickasaws have made their selections as aforesaid, the said persons of African descent mentioned in the third article of the treaty shall make their selections as therein provided, in the event of the making of the laws, rules and regulations aforesaid, after the expiration of ninety days from the date at which the Kansas Indians are to make their selections as therein provided, and the actual occupancy of such persons of African descent shall have the same effect in their behalf as the occupancies of the Choctaws and Chickasaws."

" ART. 43. The United States promise and agree that no white person, except officers, agents and employés of the Government,

and of any internal improvement company, or persons traveling through, or temporarily sojourning in, the said nations, or either of them, shall be permitted to go into *said territory*, unless formally incorporated and naturalized by the joint action of the authorities of both nations into one of the said nations of Choctaws and Chickasaws, according to their laws, customs or usages ; but this article is not to be construed to affect parties heretofore adopted, or to prevent the employment temporarily of white persons who are teachers, mechanics or skilled in agriculture, or to prevent the legislative authorities of the respective nations from authorizing such works of internal improvement as they deem essential to the welfare and prosperity of the community, or be taken to interfere with, or invalidate, any action which has heretofore been had, in this connection, by either of the said nations."

By Article 46 it was provided: "Of the moneys stipulated to be paid to the Choctaws and Chickasaws under this treaty for the *cession* of the Leased District, and the admission of the Kansas Indians among them, the sum of one hundred and fifty thousand dollars shall be advanced and paid to the Choctaws, and fifty thousand dollars to the Chickasaws, through their respective treasurers, as soon as practicable after the ratification of this treaty, to be repaid out of said money or any other moneys of said nations in the hands of the United States; the residue, not affected by any provision of this treaty, to remain in the Treasury of the United States at an annual interest of not less than five per cent, no part of which shall be paid out as annuity, but shall be annually paid to the treasurer of said nations, respectively, to be regularly and judiciously applied, under the direction of their respective legislative councils, to the support of their government, the purposes of education, and such other objects as may be best calculated to promote and advance the welfare and happiness of said nations and their people respectively."

"ART. 51. It is further agreed that all treaties and parts of treaties inconsistent herewith be, and the same are hereby, declared null and void." 14 Stat. 769–781.

It is unnecessary to refer to any other provisions of the treaty

of April 28, 1866; for none of them throw any light on the present inquiry.

The lands in dispute—being tract 5 and marked Wichitas on the above map—constitute a part of the Leased District which was *ceded* to the United States by the third section of the treaty of 1866. That is admitted. Did that treaty make an absolute, unconditional cession to the United States of these lands, free of any trust, express or implied? Or, stating the question in another form, is it consistent with that treaty to hold, as the court below did, that the lands were ceded to the United States in trust that the lands themselves, or, if they were appropriated or taken by the United States, their value, should be paid to the Indians whenever they ceased to be used exclusively for the settlement of Indians thereon?

There was much discussion at the bar as to the principles that should govern the court when determining the scope and effect of a treaty between the United States and Indian tribes. All agree that as a general rule in the interpretation of written instruments the intention of the parties must control, and that such intention is to be gathered from the words used—the words being interpreted, not literally nor loosely, but according to their ordinary signification. If the words be clear and explicit, leaving no room to doubt what the parties intended, they must be interpreted according to their natural and ordinary significance. If the words are ambiguous, then resort may be had to such evidence, written or oral, as will disclose the circumstances attending the execution of the instrument and place the court in the situation in which the parties stood when they signed the writing to be interpreted.

To what extent, if at all, have these rules been enlarged or modified when the instrument to be interpreted is a treaty between the United States and Indian tribes? In *The Kansas Indians*, 5 Wall. 737, 760, it was said that enlarged rules of construction have been adopted in reference to Indian treaties, citing as the words of Chief Justice Marshall in *Worcester* v. *Georgia*, 6 Pet. 515, 563, 582 (but which were in fact the words of Mr. Justice McLean in his concurring opinion in that case), the following: " The language used in treaties with the Indians

should never be construed to their prejudice.   If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." Mr. Justice McLean further said: "How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction." In *United States* v. *Kagama*, 118 U. S. 375, 383, 384, the Indian tribes in this country are spoken of as wards of the Nation, communities dependent for their food and their political rights, as well as for protection, on the United States.   And in *Choctaw Nation* v. *United States*, 119 U. S. 1, 28, it was said that the relation between the United States and the Indian tribes was that of superior and inferior, and that the rules to be applied in the case then before the court were those that govern public treaties, which, even in case of controversies between nations equally independent, were not to be interpreted as rigidly as documents between private persons governed by a system of technical law, " but in the light of the larger reason and the superior justice that constitute the spirit of the law of nations."   In *Jones* v. *Meehan*, 175 U. S. 1, 11, it was said that a treaty between the United States and an Indian tribe must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.

But in no case has it been adjudged that the courts could by mere interpretation or in deference to its view as to what was right under all the circumstances, incorporate into an Indian treaty something that was inconsistent with the clear import of its words.   It has never been held that the obvious, palpable meaning of the words of an Indian treaty may be disregarded because, in the opinion of the court, that meaning may in a particular transaction work what it would regard as injustice to the Indians.   That would be an intrusion upon the domain committed by the Constitution to the political departments of the Government.   Congress did not intend, when passing the act under which this litigation was inaugurated, to invest the Court of Claims or this court with authority to determine

whether the United States had, in its treaty with the Indians, violated the principles of fair dealing. What was said in *The Amiable Isabella*, 6 Wheat. 1, 71, 72, is evidently applicable to treaties with Indians. Mr. Justice Story, speaking for the court, said : " In the first place, this court does not possess any treaty-making power. That power belongs by the Constitution to another department of the Government, and to alter, amend or add to any treaty by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power and not an exercise of judicial functions. It would be to make, and not to construe a treaty. Neither can this court supply a *casus omissus* in a treaty, any more than in a law. . We are to find out the intention of the parties by just rules of interpretation applied to the subject-matter ; and, having found that, our duty is to follow it as far as it goes and to stop where that stops — whatever may be the imperfections or difficulties which it leaves behind. . . . In the next place, this court is bound to give effect to the stipulations of the treaty in the manner and to the extent which the parties have declared, and not otherwise. We are not at liberty to dispense with any of the conditions or requirements of the treaty, or to take away any qualification or integral part of any stipulation, upon any notion of equity or general convenience, or substantial justice. The terms which the parties have chosen to fix, the forms which they have prescribed, and the circumstances under which they are to have operation, rest in the exclusive discretion of the contracting parties, and whether they belong to the essence or the modal part of the treaty, equally give the rule to the judicial tribunals."

So in *Beecher* v. *Wetherby*, 95 U. S. 517, 525, which involved the question whether the fee to certain lands was in the United States, with the right of occupancy only in certain Indians, this court said : " It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter

open to discussion in a controversy between third parties, neither of whom derives title from the Indians. The right of the United States to dispose of the fee of lands occupied by them has always been recognized by this court from the foundation of the Government."

The same principle was announced in *United States* v. *Old Settlers*, 148 U. S. 427, 468. That suit was brought under an act of Congress authorizing the Court of Claims to pass upon a claim preferred by an Indian tribe, the intention of Congress, as stated in the act, being "to allow the said Court of Claims unrestricted latitude in adjusting and determining the said claim, so that the rights, legal and equitable, both of the United States and of said Indians, may be fully considered and determined." In that case it was sought to have the claimants relieved of certain provisions of a treaty, because of fraud and duress alleged to have been practised by the United States. But this court said : " There is nothing in the jurisdictional act of February 25, 1889, inconsistent with the treaty of 1846, (or any other,) and nothing to indicate that Congress attempted by that act to authorize the courts to proceed in disregard thereof. Unquestionably a treaty may be modified or abrogated by an act of Congress, but the power to make and unmake is essentially political and not judicial, and the presumption is wholly inadmissible that Congress sought in this instance to submit the good faith of its own action or the action of the Government to judicial decision, by authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act does not in the least degree justify any such inference."

In the jurisdictional act of March 2, 1895, 28 Stat. 876, 898, c. 188, Congress authorized suit to be brought in the Court of Claims, so that the rights, legal and equitable, of the United States and of the Choctaw and Chickasaw Nations, and the Wichita and Affiliated Bands of Indians in the premises "shall be fully considered and determined, and to try and determine all questions that may arise on behalf of either party "—taking care, however, to add that nothing in the act " shall be accepted or construed as a confession that the United States admit that

the Choctaw and Chickasaw Nations have any claim to or interest in said lands or any part thereof." It is thus clear that the Court of Claims was without authority to determine the rights of parties upon the ground of mere justice or fairness, much less, under the guise of interpretation, to depart from the plain import of the words of the treaty. Its duty was to ascertain the intent of the parties according to the established rules for the interpretation of treaties. Those rules, it is true, permit the relations between Indians and the United States to be taken into consideration. But if the words used in the treaty of 1866, reasonably interpreted, import beyond question an absolute, unconditional cession of the lands in question to the United States free from any trust, then the court cannot amend the treaty or refuse to carry out the intent of the parties, as gathered from the words used, merely because one party to it held the relation of an inferior and was politically dependent upon the other, or because in the judgment of the court the Indians may have been overreached. To hold otherwise would be practically to recognize an authority in the courts not only to reform or correct treaties, but to determine questions of mere policy in the treatment of the Indians which it is the function alone of the legislative branch of the Government to determine.

It is said in the present case that the interpretation of the treaty in accordance with the views of the United States would put the Government in the attitude of having acquired lands from the Indians at a price far below their real value. Even if this were true it would not authorize the court in determining the legal rights of the parties to proceed otherwise than according to the established principles of interpretation, and out of a supposed wrong to one party evolve a construction not consistent with the clear import of the words of the treaty. If the treaty of 1866, according to its tenor and obvious import, did injustice to the Choctaws and Chickasaws, the remedy is with the political department of the Government. As there is no ground to contend in this case that that treaty, if interpreted according to the views of the Government, was one beyond the power of the parties to make, it is clear that even if the United States did not deal generously with the Choctaws and Chicka-

saws in respect of the lands in dispute—and we do not mean to say that there is any ground whatever for so contending—the wrong done must be repaired by Congress, and cannot be remedied by the courts without usurping authority that does not belong to them.

Looking now at the treaty of 1866, we are unable to concur in the interpretation placed upon it by the Court of Claims. In our opinion its words plainly and obviously import a cession to the United States of the territory constituting the Leased District unaccompanied by any condition in the nature of a trust, express or implied, except that the *money* to be paid by the United States in consideration of the cession was to be invested and held by the United States "in trust" for certain specified objects. The declaration of a trust touching the money, and the failure to accompany the cession of the lands with any declaration of a trust in respect to them, manifestly shows that there was an intention to pass to the United States an absolute title to the lands and to abrogate the existing lease. The words in Article 3 of the treaty, "the Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby *cede* to the United States *the territory* west of the 98° of west longitude *known as the Leased District*," and the words in Article 46, "of the moneys stipulated to be paid to the Choctaws and Chickasaws under this treaty *for the cession of the Leased District*," so clearly exclude the idea of trust in reference to the lands, that a different meaning cannot be attached to them without doing violence to the words used by the parties. It cannot be doubted, as we have heretofore said, that during the negotiations resulting in the treaty of 1866 the parties well knew that the territory constituting the Leased District was held by the United States, not absolutely or in fee, but under lease, for the permanent settlement thereon of the Wichita and certain other tribes or bands of Indians. The treaty of 1855 shows that upon its face. Now there is nothing whatever in the treaty of 1866 that evinces a purpose to preserve the relations of lessor and lessee in respect to the lands constituting the Leased District. On the contrary, the relations of the parties having been disturbed or destroyed by the Civil War, there was

a manifest purpose not to renew and continue the relations of lessor and lessee, but to have the territory in question ceded absolutely to the United States.

It is said that the treaty of 1866, if interpreted in the light of what occurred at the Fort Smith council held in September, 1865, shows that the parties expected and intended that the lands ceded should be accompanied with a trust in reference to the use of the Leased District for the settlement of Indians. We cannot assent to this view. The persons at that council who represented the United States stated that the new Indian treaties to be made must contain certain stipulations. But no one of those stipulations had specific reference to the lands constituting the Leased District. It is true that of the stipulations mentioned by Commissioner Cooley at the Fort Smith council, the fifth declared that " a portion of the lands hitherto owned and occupied by you [the Indians] must be set apart for the friendly tribes now in Kansas and elsewhere, on such terms as may be agreed upon by the parties and approved by the Government, or such as may be fixed by the Government;" and that by the seventh it was provided that " no white person except officers, agents or employés of the Government, or of any internal improvement authorized by the Government, will be permitted to reside in the Territory unless formally adopted into some tribe according to the usages of the band." But those stipulations had no reference to the Leased District then held by the United States under the treaty of 1855 for the permanent settlement of Indians. The reference in the fifth and seventh proposed stipulations related, so far as the Choctaws and Chickasaws were concerned, to lands " owned *and occupied* by them," that is to the territory, respectively, of the Choctaws and Chickasaws east of the 98th degree of west longitude, which was controlled by them and in which their laws and usages prevailed. Those nations did not then occupy the Leased District, but did own and occupy lands east of that district, and in that territory their laws and usages controlled.

The treaty of 1866 contains no word or clause qualifying or limiting the absolute cession made by Article 3 of the territory constituting the Leased District. If the parties to it intended

that the lands constituting that district should continue to be held and used by the United States as they were then held and used under the treaty of 1855—this is, under lease—the treaty of 1866 would not have declared, without qualification, that the Choctaws and Chickasaws "*hereby cede*" to the United States the territory known as the Leased District, and omitted all words that would, under the most liberal interpretation, either import a continuation of the lease then existing or any trust connected with the territory ceded. It is a fact not without significance that one of the persons attesting the treaty of 1866 as a witness was an eminent lawyer who was of counsel for the Choctaws and Chickasaws during the negotiations at Washington resulting in that treaty. In the view we take of the matter, we cannot suppose that he advised the Indians that the treaty made any other than an unconditional cession of the territory known as the Leased District.

If the Indians intended, so far as they were concerned, to pass an absolute, unincumbered title to the United States, it would, we think, have been impossible to employ language more appropriate to that object than is to be found in the treaty of 1866. Our convictions upon this point are so decided that we feel constrained to say that if some of the parties had not been Indians it would never have occurred to any one that the cession of territory made by that treaty was attended by conditions in the nature of a trust. While the dependent character of the Indians makes it the duty of the court to closely scrutinize the provisions of the treaty and to interpret them "in the light of the larger reason and the superior justice that constitute the spirit of the law of nations," *Choctaw Nation* v. *United States*, 119 U. S. 1; 28, the court must take care, when using its power to ascertain the intention of the parties, not to disregard the obvious import of the words employed, and thereby, in effect, determine questions of mere governmental policy. We may repeat, that if wrong was done to the Indians by the treaty of 1866, interpreted as we have indicated—and we are not to be understood as expressing the opinion that they were not under all the circumstances fairly dealt with—the wrong can be repaired by that branch of the Government having full power over the subject.

It is said that the interpretation placed by us upon the Choctaw-Chickasaw treaty of 1866 is inconsistent with that placed by the United States upon the treaties made in the same year with the Seminoles and the Creeks—all of which treaties contemplated a new policy for the Indian country and for the Indians. Let us see what are the facts in relation to those treaties.

The preamble of the treaty with the Seminoles, (which was concluded March 21, 1866, and proclaimed August 16, 1866, 14 Stat. 755,) recited: "Whereas existing treaties between the United States and the Seminole Nation are insufficient to meet their mutual necessities; and whereas the Seminole Nation made a treaty with the so-called Confederate States, August 1, 1861, whereby they threw off their allegiance to the United States, and unsettled their treaty relations with the United States, and thereby incurred the liability of forfeiture of all lands and other property held by grant or gift of the United States; and whereas a treaty of peace and amity was entered into between the United States and the Seminole and other tribes at Fort Smith, September 10, 1865, whereby the Seminoles revoked, cancelled and repudiated the said treaty with the so-called Confederate States; and whereas the United States, through its commissioners, in said treaty of peace, promised to enter into treaty with the Seminole Nation to arrange and settle all questions relating to and growing out of said treaty with the so-called Confederate States; and whereas the United States, in view of said treaty of the Seminole Nation and the enemies of the Government of the United States, and the consequent liabilities of said Seminole Nation, and in view of its urgent necessities for more lands in the Indian Territory, requires a *cession* by said Seminole Nation of a part of its present reservation, and is willing to pay therefor a reasonable price, while at the same time providing new and adequate lands for them." And by the 3d article of that treaty it was provided: "*In compliance with the desire of the United States to locate other Indians and freedmen thereon,* the Seminoles cede and convey to the United States their entire domain, being the tract of land ceded to the Seminole Indians by the Creek Nation under the provision of article first, treaty

of the United States with the Creeks and Seminoles, made and concluded at Washington, D. C., August 7, 1856. In consideration of said grant and cession of their lands, estimated at 2,169,080 acres, the United States agrees to pay said Seminole Nation the sum of $325,362, said purchase being at the rate of fifteen cents per acre. The United States having obtained by grant of the Creek Nation the westerly half of their lands, hereby grant to the Seminole Nation the portion thereof hereafter described, which shall constitute the national domain of the Seminole Indians."

The treaty concluded with the Creeks June 14, 1866, and proclaimed August 11, 1866, 14 Stat. 785, contained a preamble similar to the one in the treaty with the Seminoles, and which, in addition, stated that "the United States *required* of the Creeks a portion of their land whereon to settle other Indians." And by the 3d article of that treaty it was provided: "*In compliance with the desire of the United States to locate other Indians and freedmen thereon,* the Creeks hereby cede and convey to the United States, to be sold to and used as homes for such other civilized Indians as the United States may choose to settle thereon, the west half of their entire domain, to be divided by a line running north and south; the eastern half of said Creek Lands being retained by them shall, except as otherwise herein stipulated, be forever set apart as a home for said Creek Nation; and in consideration of said cession of the west half of their lands, estimated to contain 3,250,560 acres the United States agree to pay the sum of thirty cents per acre, amounting to $975,168, in the manner hereinafter provided."

By the Indian Appropriation Act of March 2, 1889, c. 412, 25 Stat. 980, 1004, the sum of $1,912,942.02 was appropriated "to pay in full the Seminole Nation of Indians for all the right, title, interest and claim which said nation of Indians may have in and to certain lands ceded by Article 3" of the above treaty with the Seminoles. And by an act approved March 1, 1889, c. 317, 25 Stat. 759, 799, Congress appropriated $2,280,857.10 to pay the Creek Nation for the lands ceded by the treaty of 1866 with them—the agreement with those Indians which was the basis of the above act reciting, among other things, that

the United States desired that "all of said ceded lands may be entirely freed from any limitation in respect to the use and enjoyment thereof."

Now, it is argued that if the interpretation placed by the United States upon the treaty of 1866 with the Choctaws and Chickasaws is accepted the result will be that the General Government has been more liberal towards the Seminoles and Creeks than it has been with the Choctaws and Chickasaws. But that cannot constitute a reason why the court should depart from the ordinary signification of the words used in the treaty with the Choctaws and Chickasaws. If Congress chose to adopt one course towards the Seminoles and Creeks, and a different course towards the Choctaws and Chickasaws, it is not for the judiciary to defeat the will of the legislative branch of the Government by giving to an Indian treaty a meaning not justified by its words.

Apart from this last view we find clauses in the treaties with the Seminoles and Creeks which are not in the treaty with the Choctaws and Chickasaws, and which throw light upon the refusal of the United States to make an appropriation to the latter tribes on account of the particular lands here in question. In the treaties of 1866 with the Seminoles and Creeks, respectively, by which they ceded certain lands to the United States, it is expressly stated that the cession was made "in compliance with the desire of the United States to locate other Indians and freedmen thereon." No such words are found in the treaty of cession concluded with the Choctaws and Chickasaws. When the United States concluded the treaty of 1866 with the Choctaws and Chickasaws it did not need a cession of the lands here in question in order simply to locate Indians and freedmen on them. It already had, by the treaty of 1855, a perpetual lease of those lands for the settlement of Indians. What it needed, perhaps what it required—at any rate, what it obtained—was an unqualified cession of the territory, unaccompanied by any declaration as to the use intended to be made of it, or by any words qualifying the absoluteness of the title passed to the United States. It took an absolute cession, without any declaration as to the uses to which the territory ceded was to be devoted,

It may be that other considerations than those referred to caused the use of the words in the treaties with the Seminoles and Creeks that are not to be found in the treaty with the Choctaws and Chickasaws. But in our judgment the words of the treaty of 1866 with the Choctaws and Chickasaws so clearly import a cession of title without limitation as to the uses to which the ceded territory was to be devoted, that the claim of those Indians can derive no support from the transactions between the United States and the Seminoles and Creeks.

But the Choctaws and Chickasaws lay great stress on the following paragraph in section 15 of the Indian Appropriation Act of March 3, 1891, 26 Stat. 989, 1025, c. 543 : " And the sum of $2,991,450 be, and the same is hereby, appropriated out of any money in the Treasury not otherwise appropriated, to pay the Choctaw and Chickasaw Nations of Indians for all the right, title, interest and claim which said nations of Indians may have in and to certain lands now occupied by the Cheyenne and Arapahoe Indians under executive order; said lands lying south of the Canadian River, and now occupied by the said Cheyenne and Arapahoe Indians, said lands have been ceded in trust by Article 3 of the treaty between the United States and said Choctaw and Chickasaw Nations of Indians, which was concluded April 28, 1866, and proclaimed on the 10th day of August of the same year, and whereof there remains, after deducting allotments as provided by said agreement, a residue ascertained by survey to contain 2,393,160 acres; three fourths of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Choctaw Nation to receive the same, at such time and in such sums as directed and required by the legislative authority of said Choctaw Nation, and one fourth of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Chickasaw Nation to receive the same, at such times and in such sums as directed and required by the legislative authority of said Chickasaw Nation; this appropriation to be immediately available and to become operative upon the execution, by the duly appointed delegates of said respective nations specially authorized thereto by law, of releases and convey-

ances to the United States of all the right, title, interest and claim of said respective nations of Indians in and to said land (not including Grier County, which is now in dispute), in manner and form satisfactory to the President of the United States; and said releases and conveyances, when fully executed and delivered, shall operate to extinguish all claim of every kind and character of said Choctaw and Chickasaw Nations of Indians in and to the tract of country to which said releases and conveyances shall apply."

It is argued that the words in the above paragraph, "said lands have been ceded in trust by Article 3 of the treaty between the United States and said Choctaw and Chickasaw Nations of Indians, which was concluded April 28, 1866," must be taken as an admission by the United States in 1891 that the cession made by the treaty of 1866 was not intended to be absolute and unconditional, but in trust to be used for the settlement of Indians, upon the abandonment of which object by the United States the ceded lands reverted to the Indians.

There would be force in this contention if it appeared that the legislative and executive branches of the Government had adhered to the declaration in the act of March 3, 1891. But such is not the fact. For at the next session of Congress, President Harrison, by special message, dated February 18, 1892, called attention to the above paragraph, and among other things said: "If this section had been submitted to me as a separate measure, especially during the closing hours of the session, I should have disapproved it; but as the Congress was then in its last hours a disapproval of the general Indian appropriation bill of which it was a part would have resulted in consequences so far-reaching and disastrous that I felt it my duty to approve the bill. But as a duty was devolved upon me by the section quoted, viz.: the acceptance and approval of the conveyances provided for, I have felt bound to look into the whole matter, and in view of the facts which I shall presently mention, to postpone any executive action until these facts could be submitted to Congress."

After referring to some matters that have no connection with the inquiry as to the meaning of the treaty of 1886 with the

Choctaws and Chickasaws, the President proceeded : " After a somewhat careful examination of the question, I do not believe that the lands for which this money is to be paid were, to quote the language of section 15 of the Indian appropriation bill, already set out, ' ceded in trust by Article 3 of the treaty between the United States and said Choctaw and Chickasaw Nations of Indians, which was concluded April 28, 1866,' etc. It is agreed that the treaty contained no express limitation upon the uses to which the United States might put the territory known as the Leased District. The lands were ceded by terms sufficiently comprehensive to have passed the full title of the Indians. The limitation upon the use to which the Government might put them is sought to be found in a provision of the treaty by which the United States undertook to exclude white settlers, and in the expressions found in the treaties made at the same time with the Creeks and other tribes of the purpose of the United States to use the lands ceded by those tribes for the settlement of friendly Indians. The stipulation as to the exclusion of white settlers might well have reference solely to the national lands retained by the Choctaw and Chickasaw tribes, and the reason for the nonincorporation in the treaty with them of a statement of the purpose of the Government in connection with the use of the lands is well accounted for by the fact that as to these lands the Government had already, under the treaty of 1855, secured the right to use them perpetually for the settlement of friendly Indians. This was not true as to the lands of the other tribes referred to. The United States paid to the Choctaws and Chickasaws $300,000, and the failure to insert the words that are called words of limitation in this treaty points, I think, clearly to the conclusion that the commissioners on the part of the Government, and the Indians themselves, must have understood that this Government was acquiring something more than a mere right to settle friendly Indians, which is already possessed, and something more than the mere release of the right which the Choctaws and Chickasaws had under the treaty of 1855 to select locations on these lands if they chose. Undoubtedly it was the policy of this Government for the time to hold these and the adjacent lands as Indian country, and many of

the expressions in the proclamations of my predecessors and in the reports of the Indian Bureau and of the Secretary of the Interior mean this and nothing more. This is quite different from a conditional title which limits the grant to a particular use and works a reinvestment of full title in the Indian grantors when that use ceases. But those who hold most strictly that a use for Indian purposes, where it is expressed, is a limitation of title seem to agree that the United States might pass a fee absolute to other Indian tribes in the land ceded for their occupancy. Certainly it was not intended that in settling friendly Indians upon these lands the Government was to be restrained in its policy of allotment and individual ownership. If, for an adequate consideration by treaty, the United States placed upon these lands other Indian tribes, it was competent to give them patents in fee for a certain and agreed reservation. This being so, when the policy of allotment is put into force the compensation for the unused lands should certainly go to the occupying tribe, which, in the case supposed, had paid a full consideration for the whole reservation. It will hardly be contended that in such case this Government should pay twice for the lands. . . . It is right also, I think, that Congress in dealing with this matter should have the whole question before it; for the declaration of Indian title contained in this item of appropriation extends to a very large body of land and will involve very large future appropriations. The Choctaw and Chickasaw Leased District, embracing the lands in the Indian Territory between the 98th and 100th degrees of west longitude and extending north and south from the main Canadian River to the Red River, including Greer County, contains, according to the public surveys, 7,713,239 acres, or, excluding Greer County, 6,201,663 acres. This Leased District is occupied as follows: Greer County, by white citizens of Texas, 1,511,576 acres. The United States is now prosecuting a case in the courts to obtain a judicial declaration that this county is part of the Indian country. If a decision should be rendered in its favor, the claim of the Choctaws and Chickasaws to be paid for these lands at the rate named in this appropriation would at once be presented. . . . Under the treaty of 1855 the Choctaws and Chickasaws quit-

claimed any supposed interest of theirs in the lands west of the 100th degree. The boundary between the Louisiana purchase and the Spanish possessions by our treaty of 1819 with Spain was, as to these lands, fixed upon the 100th degree of west longitude. Our treaty with the Choctaws and Chickasaws, made in 1820, extended their grant to the limit of our possessions. It follows, of course, that these lands were included within the boundaries of the State of Texas when that State was admitted into the Union, and the release of the Choctaws and Chickasaws, whatever it was worth, operated for the benefit of the State of Texas, and not of the United States. The lands became public lands of that State. For the release of this claim and for the lease of the lands west of the 98th degree the Government of the United States paid the sum of $800,000. In the calculations which have been made to arrive at the basis of the appropriations under discussion, no part of this sum is treated as having been paid for the lease. I do not think that this is just to the United States. It seems probable that a very considerable part of this consideration must have related to the leased lands, because these were the lands in which the Indian title was recognized and the treaty gave to the United States a permanent right of occupation by friendly Indians. The sum of $300,000, paid under the treaty of 1866, is deducted, as I understand, in arriving at the sum appropriated. It seems to me that a considerable proportion of the sum of $800,000 previously paid should have been deducted in the same manner. I have felt it my duty to bring these matters to the attention of Congress for such action as may be thought advisable."

The president's message having been referred by the Senate to its committee on Indian affairs, that committee made a report accompanied by the following resolution: "*Resolved*, That for reasons set forth in the report of the Committee on Indian Affairs upon the President's message of February 18, 1892, upon the appropriation of March 3, 1891, for payment to the Choctaw and Chickasaw Nations for their interest in the Cheyenne and Arapahoe reservation in the Indian Territory, submitted with this resolution, it is the opinion of the Senate that there is no sufficient reason for interference in the due execution

of the law referred to." Congr. Rec. 52d Cong. 1st Sess. vol. 23, Pt. 5, p. 4093. The resolution was adopted, and one of similar import was adopted by the House of Representatives.

But on the 15th day of December, 1892, the House of Representatives passed the following resolution: "*Resolved by the Senate and House of Representatives,* That the Secretary of the Treasury be, and he is hereby, directed to retain and cover back into the Treasury $48,800 of the appropriation made by Congress to pay the Choctaw and Chickasaw tribes of Indians for their interest in lands of the Cheyenne and Arapahoe reservation, dated March 3, 1891, which amount has been ascertained, by a recount of the allottees of said Cheyennes and Arapahoes to be by that amount more than is due the said Choctaws and Chickasaws upon the purchase and settlement for their said interest." The Senate amended that resolution by adding thereto this proviso: "*Provided, however,* That neither the passage of the original act of appropriation to pay the Choctaw and Chickasaw tribes of Indians for their interest in the lands of the Cheyenne and Arapahoe reservation, dated March 3, 1891, nor of this joint resolution shall be held in any way *to commit the Government to the payment of any further sum to the Choctaw and Chickasaw Indians for any alleged interest in the remainder of the lands situated in what is commonly known and called the Leased District.*" In this amendment the House concurred, and on January 18, 1893, the resolution as amended was approved by the President. Congr. Rec. 52d Cong. 2d Sess. vol. 24, Pt. 1, pp. 173, 379, 868; 27 Stat. 753.

Then followed the act of 1895, 28 Stat. 876, 898, c. 188, under which the present suit was instituted, and which related to the lands in the Leased District covered by the agreement of June 4, 1891, with the Wichita and Affiliated Bands of Indians—the lands in dispute. That act contained the proviso that nothing in it "shall be accepted or construed *as a confession that the United States admit that the Choctaw and Chickasaw Nations have any claim to or interest in said lands or any part thereof.*"

It thus appears that while the majority of the members of the two Houses of Congress, at one time, were apparently of the opinion that the cession made by the treaty of 1866 with

the Choctaws and Chickasaws was incumbered with a trust that the lands be used only for purposes connected with the settlement of Indians, the Head of the Executive Department of the Government in 1892 was of opinion that no such trust existed or was intended. Evidently, the legislative branch of the Government, when it came to deal with the lands occupied by the Wichita and Affiliated Bands of Indians, under the treaty of 1855, declined to apply the rule adopted in the act of 1891 in reference to the lands in the Leased District occupied by the Cheyennes and Arapahoes, and intended by the act of 1895 to leave the whole question as to the legal and equitable rights of the United States and of the Choctaw and Chickasaw Nations in the lands now in dispute to be determined by the courts. In other words, the rights of the parties are to be determined by the rules established for the interpretation of such instruments as the treaty of 1866, giving due weight to every fact proper to be considered in ascertaining the intention of the parties. In this view, we cannot hold that the above declaration in the act of March 3, 1891, 26 Stat. 989, 1025, c. 543, that the cession made by the treaty of 1866 was attended by a trust is sufficient to defeat such interpretation of the treaty as is required by its words when reasonably interpreted or interpreted in the sense in which they were naturally understood by the Indians when they assented to the treaty.

V. We come to the material questions arising upon the appeal of the Wichita and Affiliated Bands of Indians.

We have seen in the statement of the case that by the agreement of June 4, 1891, between the United States and the Wichita and Affiliated Bands of Indians (ratified by the act of Congress of March 2, 1895, 28 Stat. 876, 895, 896, 897, c. 188) the latter ceded to the United States, without any reservation whatever, all their claim and title in and to the lands embraced in tract 5 on the above diagram, known as the Wichita Reservation. That agreement shows that in addition to the allotment of lands therein provided for, the Wichita and Affiliated Bands insisted that further compensation, in money, should be made to them by the United States for their possessory right in and to the above lands in excess of that required for the allotments.

And it was agreed that the question " as to what sum of money, if any, shall be paid to said Indians for such surplus lands " should be submitted to Congress, its decision thereon " to be final and binding upon said Indians ; " provided, if any sum of money was allowed by Congress for surplus lands, it should be subject to a reduction for each allotment of land that was taken in excess of the one thousand and sixty at that price per acre, if any, that might be allowed by Congress. It was further stipulated in the agreement of 1891 " that there shall be reserved to said Indians the right to prefer against the United States any and every claim that they may believe they have the right to prefer, save and except any claim to the tract of country described in the first article of this agreement "—the tract numbered 5 and marked " Wichitas."

The relief asked by the Wichita and Affiliated Bands was that the petition of the Choctaws and Chickasaws be dismissed ; and that it be decreed that they were entitled to the proceeds of the sale of all the lands involved in this case, to be paid to them from time to time after being deposited in the Treasury as required by the act of 1895.

The Court of Claims having decided that the Choctaws and Chickasaws were entitled to such of the lands of the Wichita Reservation as remained after making the allotments required by the act of 1895, the only relief given by the decree to the Wichita and Affiliated Bands was to adjudge that the members of those tribes were each entitled to 160 acres of land out of the lands in dispute, to be set apart for them by the United States, having due regard to any improvements made thereon by them respectively, for their permanent settlement. Of this decree the United States does not complain, but the Choctaws and Chickasaws do complain of it so far as it assigned 160 acres of land to each member of the Wichita and Affiliated Bands.

Under the views we have expressed, the Choctaws and Chickasaws have had no interest in the particular lands in dispute since the absolute cession made by them to the United States in the treaty of 1866. They have therefore no concern in the questions that have arisen between the United States and the Wichita and Affiliated Bands of Indians as to the disposition

of those lands. And as the United States does not complain of the decree in favor of the latter Indians, awarding to each 160 acres of land, the only question that remains to be considered arises on the appeal of the Wichita and Affiliated Bands, namely, whether the court below erred in not decreeing those Indians to be entitled to the proceeds of the sale of such of the lands in question as may be left after making the allotments in severalty required by the act of Congress.

The question last stated does not require any extended discussion; indeed, we are relieved of the necessity of discussing it, for the United States at the present hearing concedes that the removal of the Wichita and Affiliated Bands from their former habitations and their permanent settlement upon the Wichita Reservation invested them with a full right of occupancy of the lands in dispute and with all the incidents of such right, and that each member of those tribes is now entitled to receive 160 acres in severalty, and "also the proceeds of the balance of the land whenever such sales are made as authorized by the jurisdictional act." "If this were all," say the representatives of the Government, "that the Wichita and Affiliated Bands claimed, the United States would indorse the appeal of these Indians instead of opposing it." The Government itself suggests—and we recognize its right under all the circumstances of this case to ask—that the decree as to the Wichita and Affiliated Bands be reversed and set aside and the cause remanded with directions that, in addition to the dismissal of the petition of the Choctaw and Chickasaw Nations, and ordering the allotment of 160 acres of land in the Wichita Reservation to each member of those tribes, they have the benefit of the proceeds of the sale of such lands in the Wichita Reservation as are not needed for the purposes indicated in the act of Congress.

To what compensation are the Wichita and Affiliated Bands entitled on account of the lands not needed for the allotments required by the act of Congress? Upon this question this court does not feel bound to express any opinion. The agreement of 1891 between the United States and the Indians shows that the question of the amount of money, if any, to be paid to the Indians on account of the surplus lands was in dispute and was

left to the determination of Congress, whose action, it was agreed, should be final and binding on the Indians; and then by the act of Congress that question was referred to the Court of Claims, with a right of appeal to this court. But Congress did not indicate any rule for the guidance of the Court of Claims in fixing the amount due the Indians. It only declared that the compensation allowed in the present suit should not exceed one dollar and twenty-five cents per each acre of land not required for the allotments in severalty. This implied that in the judgment of Congress a less amount might suffice to meet the legal and equitable rights of the Indians and the ends of justice. For the purpose of fixing that compensation, should the surplus lands be valued as of the date the Indians were located on the Reservation, or of the date the agreement of 1891 was ratified by Congress, or of the date when this suit was brought, or of the date when the allotments are all made? Upon these points the act of Congress is silent. The decree in the present suit should declare that the Wichita and Affiliated Bands are entitled to compensation in money for such of the lands as are not needed to meet the requirements of the act of March 2, 1895, 28 Stat. 894, 897, c. 188, leaving the amount to be fixed upon such evidence as may be adduced by the parties, but not, in any event, exceeding the limit prescribed by Congress.

The United States insists that it should be made a condition of any decree recognizing the right to compensation on account of the surplus lands, that the Wichita and Affiliated Bands should execute a release to the United States of all right, title, interest and claim of every nature whatsoever in and to any lands within the limits of the United States except those allotted to them. This view cannot be adopted, because the pleadings do not inform the court of the existence of any claims of that kind; indeed, the pleadings could not properly embrace any claim to lands, or to the proceeds of any lands, except those within the Wichita Reservation. The court below could not make any decree in reference to claims that have not been referred to it by Congress. It is manifest that while Article 6th of the agreement of 1891 between the United States and the Wichita and

Affiliated Bands of Indians reserved the right of the latter to prefer against the United States any and every claim they believed they had the right to make, the only suit authorized by the jurisdictional act of 1895 was one that would determine the claim of the Choctaws and Chickasaws of an interest *in the particular lands here in dispute*, and the claim of the Wichita and Affiliated Bands to be compensated in money for their possessory right *in such lands*. No suit was authorized by that act that would embrace any and every claim that the Wichita and Affiliated Bands might elect to prefer against the United States.

For the reasons given the decree must be reversed with directions to dismiss the petition of the Choctaw and Chickasaw Nations, and to make a decree in behalf of the Wichita and Affiliated Bands of Indians fixing the amount of compensation to be made to them on account of such lands in the Wichita Reservation as are not needed in order to meet the requirements of the act of Congress of March 2, 1895, c. 188, and for such further proceedings as may be consistent with law and with this opinion.

*It is so ordered.*