HONOKAA SUGAR COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 101358.   Promulgated December 20, 1940.

*A. L. Castle, Esq.,* and *E. R. Cameron, C. P. A.,* for the petitioner.
*T. M. Mather, Esq.,* for the respondent.

#### OPINION.

SMITH: This is a proceeding for the redetermination of a deficiency of $17,103.18 in income tax for 1937.   The petition alleges that the

respondent erred in the determination of the deficiency (1) in including in gross income an estimated amount to be received on a shipment of sugar during December 1937 instead of the correct amount which was determined in 1938, and (2) in denying a credit under section 26 (c) (1) of the Revenue Act of 1936 for the amount of the adjusted net income which could not be distributed to stockholders without violating a written contract executed by the petitioner.

Most of the facts material to this proceeding are contained in a written stipulation of facts with exhibits attached, which are incorporated herein by reference.

The facts pertinent to the two issues presented may be briefly stated as follows:

The petitioner is a corporation organized and existing under and by virtue of the laws of the Territory of Hawaii, and is primarily engaged in the cultivation, manufacture, and sale of sugar. Its principal office is at Honolulu, T. H.

The petitioner's books of account are kept and its income tax returns are made on the accrual basis and for the calendar year.

During December 1937 the petitioner shipped 1,272.81 tons of raw sugar to the California-Hawaiian Sugar Refining Corporation (hereinafter sometimes called the buyer), a marketing organization which was incorporated under the laws of the State of California and owned and operated a sugar refinery at Crockett, California. The sugar arrived at the refinery on December 28, 1937. According to the contract which the petitioner had with the buyer, title to the sugar passed to the buyer on arrival. The amount to be paid for the sugar was to be determined in accordance with the terms of a written contract.

The fiscal year of the buyer ends on November 30. The sugars of any contract year are sugars shipped on or before November 30 of the contract year. The contract provides that within a few days after the arrival of the sugar at the refinery the shipper, in this case the petitioner, is to be paid 75 percent of the "average market price", such average market price being the average price at which raw sugar is selling within a short time before and after the date of arrival. Supplemental payments are to be made after the initial payment and from time to time throughout the contract year, and final payment is to be made not later than December 15 following the close of the contract year. The exact amounts depend upon a number of factors which it is not necessary to set forth here.

During the month of December 1937 the petitioner was paid a gross of $63,133.33 ($55,841.54 net after deduction of freight and various charges), representing the initial payment. This amount

was duly incorporated in the petitioner's income and excess profits tax return for 1937. The balance to be received by the petitioner upon its shipment could not be determined until after the refinery closed its fiscal year on November 30, 1938. Since, however, the petitioner had charged as expenses of 1937 the cost of producing the 1937 crop, it reported as taxable income not only the net amount of $55,841.54 referred to above, but also an amount which it estimated that it would later receive on its shipment of 1,272.81 tons. That amount was a net of $17,882.67 or a gross amount of $18,341.19 less expenses of $458.52. These amounts of $18,341.19 and $458.52 were included in gross income and deductions, respectively, in the petitioner's original and amended returns for income and excess profits taxes for the calendar year 1937.

During the calendar year 1938 the petitioner received as final payment on its 1,272.81 tons of raw sugar so sold and delivered on December 28, 1937, $11,887.46 less expenses of $297.16, or $6,453.73 and $161.36, respectively, less than the amounts estimated by the petitioner and included in its original and amended income and excess profits tax returns for 1937.

The respondent in his determination of petitioner's gross and net income for the calendar year 1937 has failed to substitute for the estimated amounts of $18,341.19 and $458.52 the above stated amounts of $11,887.46 and $297.16.

In 1932 the petitioner had outstanding a bond issue in the amount of $320,000. The bonds matured in 1933. The petitioner proposed to the bondholders an extension of the maturity date and submitted for their approval a bond extension agreement. The owners of $251,000 of the bonds readily gave their written consent to the extension agreement. The largest individual bondholder was the William G. Irwin Estate Co., of San Francisco, California, which held $52,000 of the bonds. Under date of January 16, 1933, it wrote a letter to F. A. Schaefer & Co., Ltd., of Honolulu (attention of J. W. Waldron), the agent of the petitioner, stating therein:

Referring to the letter from the writer to Mr. Waldron dated November 21, 1932, to previous correspondence and to the conferences held here between Mr. Waldron and the writer, regarding a proposal to extend the maturity of the bonds of Honokaa Sugar Company,—we have executed and acknowledged and now hand you agreement dated December 19, 1932, between Honokaa Sugar Company, First Party, Bishop Trust Company, Limited, Second Party and the undersigned, Third Party, as the holder of Fifty-two thousand Dollars of Bonds issued under the Deed of Trust from the First Party to Second Party, as Trustee, dated June 30, 1908.

This agreement is in the same form as the agreement signed by the holders of Two Hundred and Fifty-one Thousand Dollars of the said bonds and which you exhibited to the writer. This agreement is to become binding upon the undersigned and you are authorized to deliver the agreement to Honokaa

Sugar Company, or otherwise make use of the same, only upon the conditions that:

a. We shall receive a legal opinion from Messrs. Robertson & Castle, stating in substance that the signature to the extension agreement by bondholders will not prejudice their security in any way, and that the bonds as so extended will constitute the enforcible obligation of the Honokaa Sugar Company, and will be secured by the mortgage deed of trust as a first lien upon the property therein described.

b. The execution by Honokaa Sugar Company of an agreement in favor of those bondholders who signed the extension agreement, and specifically stated to be enforcible by the Trustee under the mortgage deed of trust, covenanting that the Sugar Company will not declare any dividends while any of the bonds remain unpaid.

c. An agreement by the Honokaa Sugar Company and/or the Trustee under the mortgage deed of trust, that when amounts are available in the Sinking Fund for the redemption or purchase of bonds, that invitations shall be extended to bondholders generally to offer bonds to the Sinking Fund so that there will be no preference as between the several bondholders with respect to the opportunity to secure payment of bonds in advance of the new maturity.

\*     \*     \*     \*     \*     \*     \*

In the event that the above mentioned conditions are not carried out, the accompanying extension agreement is to become void and you are to return the same to the undersigned.

At a meeting of the board of directors of the petitioner held January 24, 1933, the conditions stated in the above entitled letter were accepted by the petitioner. The minutes of that meeting provide in part as follows:

Mr. Castle then stated that a legal opinion would be furnished by Robertson & Castle to cover condition (a).

In regard to condition (b) it was the understanding of the bondholders executing the said agreement of December 19, 1932, that the Company would not pay or declare any dividends while any of the bonds remain unpaid; that although not specifically set forth in said agreement it was understood and agreed, and as part of the consideration for the execution of said agreement, the Company would by proper resolution provide against the payment of dividends while bonds were still outstanding.

Mr. M. B. Henshaw thereupon offered the following resolution, and moved its adoption:

"Whereas it was understood and agreed by and between the Bondholders executing the Bond Extension agreement of December 19, 1932, and as a part of the consideration of said extension, that this Company would not declare or pay any dividends while any of the Company's bonds remain unpaid, and that the Company would by proper resolution record such understanding and agreement, and

Whereas it is to the best interests of this Company that said bonds be extended and that no dividends be declared or paid until all of said bonds are paid,

THEREFORE BE IT RESOLVED that this Company in consideration of the extension of its bonds until December 31, 1940, subject to the terms of a certain Bond Extension agreement dated December 19, 1932, will not declare or pay any dividends while any of its bonds remain unpaid;

AND BE IT FURTHER RESOLVED that in the event of any such declaration and/or payment of dividends in violation hereof, any bond or bonds then outstanding shall, at the option of the holder or holders thereof, become at once due and payable, and the lien of said bond may be enforced in the same manner and form as is set forth in paragraph (5) of said agreement of December 19, 1932."

The resolution was seconded by Mr. R. W. Shingle, and unanimously carried.

The outstanding bonds of the petitioner were either purchased and canceled or redeemed and canceled as follows:

| | | | |
|---|---|---|---|
| Dec. 31, 1932 | $10,000 | Dec. 31, 1935 | $50,000 |
| July 31, 1933 | 9,000 | Dec. 31, 1936 | 150,000 |
| July 31, 1933 | 21,000 | Dec. 30, 1939 | 21,000 |
| Oct. 4, 1934 | 1,000 | | |
| Oct. 11, 1934 | 31,000 | | 320,000 |
| June 19, 1935 | 27,000 | | |

Of the foregoing bonds, those canceled December 31, 1932, were redeemed in the manner provided in the deed of trust, and the remaining bonds that were canceled up to and including June 19, 1935, were purchased below par, after invitation and notice to the bondholders generally, without preference, as set forth in condition (c) of the Irwin Estate Co. letter. After June 19, 1935, there were no offers on the part of the bondholders to sell below par, so the remaining bonds were redeemed at par in the manner provided in the deed of trust.

The bonds belonging to the William G. Irwin Estate Co. were purchased, after invitations extended to the bondholders generally, on July 31, 1933, and October 11, 1934.

On August 20, 1936, petitioner declared a dividend of 50 cents per share on its capital stock, payable September 30, 1936, and on November 25, 1936, it declared a like dividend, payable December 10, 1936; no dividend was declared or paid in 1937.

In its original income and excess profits tax return for 1937 the petitioner in the determination of its undistributed net income claimed as a subtraction from its adjusted net income the credit provided in section 26 (c) of the Revenue Act of 1936, as amended, relating to contracts restricting dividends, in an amount sufficient to offset the adjusted net income reported in its return. The amended return for 1937 showed no adjusted net income.

The respondent in his determination of petitioner's income tax liability for 1937 denied as a subtraction from petitioner's adjusted net income the credit claimed under section 26 (c) of the statute relating to contracts restricting dividends on the ground "that there was no such contract in force and effect during the year 1937."

The first question presented is whether the petitioner is entitled to adjust its gross income for 1937 to accord with the sale price of its sugar raised during that year. The petitioner admits that it is

liable for income tax for 1937 upon any profit derived from the sale of that crop. It submits, however, that under its contract with its vendee it did not know until some time in 1938 just how much it was to receive for the crop. In the absence of actual knowledge it made an estimate of the amount that it was to receive. When it learned late in 1938 that its estimate was excessive in the net amount of $6,292.17, it sought to have the error corrected in the determination of its tax liability.

The respondent contends that this can not be done; that the petitioner keeps its books of account and makes its returns on the accrual basis; that the adjustment made necessary by the fact that the petitioner received for its 1937 crop $6,292.17 less than was anticipated is not a ground for adjusting the 1937 accounts, but that such adjustment should fall in the year 1938.

In *United States* v. *Anderson*, 269 U. S. 422, it was said that the purpose of Congress in permitting taxpayers to make income tax returns upon the accrual basis was to enable them:

\* \* \* to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period; and, indeed, to require the tax return to be made on that basis, if the taxpayer failed or was unable to make the return on a strict receipts and disbursements basis.

In *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182, the Court said:

\* \* \* Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. \* \* \*

In *Commissioner* v. *Old Dominion S. S. Co.* (C. C. A., 2d Cir.), 47 Fed. (2d) 148, it was said: "Income and deductions are to be included for the period to which they are truly attributable irrespective of the time of payment." In that case it was held that just compensation paid for use of a railroad's property during Government operation constituted accrued income for years in which it was earned, even though the amount was not determined or determinable until long after the taxable year had closed.

The question here is whether the amount receivable by the petitioner from the California-Hawaiian Sugar Refining Corporation in respect of the petitioner's shipment in December 1937 of 1,272.81 tons of raw sugar became "fixed" in 1937. It plainly did not. The petitioner's deductions for 1937 relate in large part to the production of the crop that was shipped and sold in 1937. Those deductions should be from the proceeds of the sales in 1937 as nearly as may be. The facts are before us for the determination of the actual proceeds.

We see no reason why the error in the estimated amounts should not be corrected. The respondent erred in failing to substitute for the estimates (income and deductions therefrom) the actual amounts stated above.

The second question is whether the petitioner is entitled to the credit provided for by section 26 (c) of the Revenue Act of 1936. That section, so far as material, provides as follows:

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. * * *

In *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U. S. 46, it was said:

* * * The natural impression conveyed by the words "written contract executed by the corporation" [§ 26 (c)] is that an explicit understanding has been reached, reduced to writing, signed and delivered. True, obligations not set out at length in a written contract may be incorporated by specific reference, or even by implication. But Congress indicated that any exempted prohibition against dividend payments must be expressly written in the executed contract. It did this by adding a precautionary clause that the granted credit can only result from a provision which "expressly deals with the payment of dividends."

The respondent has disallowed the claimed credit upon the ground that there was no contract in force and effect during 1937 with respect to the payment of dividends.

We think that the respondent's position must be sustained.

Article 26–2 (*b*) of Regulations 94 provides in part as follows:

(b) *Prohibition on payment of dividends.*—The credit provided in section 26 (c) (1) is allowable only with respect to a written contract executed by the corporation prior to May 1, 1936, which expressly deals with the payment of dividends *and operates as a legal restriction upon the corporation* as to the amounts which it can distribute within the taxable year as dividends. * * * [Italics ours.]

We think that this regulation correctly interprets the statute. Was there outstanding in 1937 any written contract executed prior to May 1, 1936, which operated as a legal restriction upon the corporation as to the amounts which it could declare and pay as dividends in 1937?

The minutes of the meeting of the board of driectors of the petitioner declare that it was the understanding of the bondholders executing the written bond extension agreement of December 19, 1932, that the petitioner would not pay or declare any dividends while any of the bonds remain unpaid. But it is pertinent to note that the written agreement contains no provision dealing in any manner with the declaration or payment of dividends.

From the stipulated facts it appears that one of its bondholders, the William G. Irwin Estate Co., owning $52,000 of the petitioner's bonds, refused to consent to the bond extension agreement except upon condition that the petitioner would agree not to pay dividends on its stock while any of its bonds were outstanding. The agreement of the petitioner to the condition stipulated undoubtedly was binding upon the petitioner so long as the Irwin Estate Co. was an owner of any of petitioner's bonds. But its bonds were purchased and canceled prior to 1935. So far as the record shows the consent of none of the other bondholders was upon the condition that no dividends should be paid on the company's stock while bonds were outstanding. There was no consideration for any contract between the petitioner and them. It is impossible to see what right they would have to restrain the petitioner in case it saw fit to declare a dividend while some of its bonds were outstanding.

It is further to be noted that the financial condition of the petitioner improved so rapidly after 1932 that by June 19, 1935, it had purchased and retired all of its outstanding bonds which could be purchased at a discount, and in 1935 and 1936 it retired at par all but $21,000 of its bonds which the owners failed to present for redemption until December 30, 1939. That the petitioner was ready and willing to redeem those bonds at par in 1936 and thereafter is apparent from the fact that in 1936 the petitioner paid two cash dividends of 50 cents each upon its 100,000 shares of stock outstanding, or the amount of $99,385, as shown by its capital stock tax return in evidence.

Furthermore, the resolutions of the board of directors upon which the petitioner relies specifically provided that if any dividend should be paid while any of the bonds were outstanding the bonds would immediately become due and payable. This indicates quite clearly that the board of directors never intended that the resolutions adopted should be an absolute bar to a future declaration of dividends where as here one or more bondholders elected to hold their bonds beyond the period when the company was able and ready to redeem them.

In support of its contention the petitioner cites *Sutcliffe Co.*, 41 B. T. A. 1009. In that case a corporation contracted with a bank from which it secured a loan that it would not pay any dividends on its shares of stock while the indebtedness continued. A new agreement was substituted for the original agreement. We held upon the evidence that the provision of the original contract carried over to the new one and that the taxpayer was entitled to credit under section 26 (c) (1) of the Revenue Act of 1936 equaling the amount of its undistributed net income. We fail to see the applicability of the legal principle enunciated in that case to the proceeding at bar.

From all of the evidence we are of the opinion that the respondent did not err in disallowing the claimed credit under section 26 (c).

Reviewed by the Board.

*Decision will be entered under Rule 50.*