CENTRAL WEST COAL COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 101491.    Promulgated June 5, 1941.

*Irving A. Puchner, Esq.*, for the petitioner.
*Gerald W. Brooks, Esq.*, for the respondent.

OPINION.

Tyson: The petitioner alleges error in the disallowance of the credits claimed in the amount of $30,000 for each of the two taxable years; and asserts further that it has made overpayments of surtax in the respective amounts of $1,917.82 and $1,579.90 shown to be due on the returns for those years because it was entitled to other credits not claimed in its returns.

Section 14 of the Revenue Act of 1936 imposes a surtax upon the undistributed net income of every corporation. It defines "undistributed net income", and, in so far as here material, that term means the net income minus the normal tax imposed by section 13 (i. e., the adjusted net income) and minus the credit provided in section 26 (c) (1). The amount of the adjusted net income is not in dispute. The sole question is whether the claimed credits are allowable under section 26 (c) (1), *supra*. The credit there authorized is:

An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. * * *

The petitioner rests its claim for the credits upon alleged restrictions contained (1) in the deed of trust securing its bonds, and (2) in the preferred stock certificates and the resolution of 1921 providing for the issuance of those certificates.

Under section 26 (c) (1), *supra*, it is essential to the allowance of credits of the claimed nature of those here involved that the written contract by reason of which the credits are claimed should operate as a legal restriction upon the corporation as to amounts which it can distribute within the taxable year as dividends. *Honokaa Sugar Co.*, 43 B. T. A. 151, 157.

The mortgage underlying the bonds is a written contract executed by the petitioner prior to May 1, 1936. It expressly deals with the payment of dividends in that it provides that, after three years from date, the petitioner "will not pay any dividend upon its common capital stock until the principal of said bonds then maturing and interest on all outstanding bonds * * * shall have been provided for." The payment of dividends is conditioned upon the principal of the then maturing bonds and interest on all outstanding bonds first being provided for and, since the record shows that the petitioner paid such obligations up to and including the times in the taxable years when they fell due (the last of such obligations in each taxable year falling due on August 1 of such year), we think the condition of providing for the payment of the bonds and interest was thus

met. It seems obvious, therefore, that, the restrictive provision against the payment of dividends having been thus removed within each of the taxable years and nine months before the ends of such years, the petitioner was free to pay dividends upon its common stock in each of those years.

However, the petitioner contends that the language of the deed as contained in paragraph 3 of article II, section 11, is ambiguous in that it does not specify the source from which the maturities and interest on the bonds shall be "provided for", and that such language should be construed as meaning that no dividends may be paid from any source other than earnings and not until such time as its earnings shall exceed the amounts paid for bond retirements and interest. Based upon this premise, that paragraph 3 is ambiguous and should be construed to have the meaning contended for, petitioner then contends further that under such construction no earnings existed during the taxable years which could be distributed as dividends because the total disbursements for bond maturities and interest amounted in the case of bond maturities alone to $220,000 from May 1, 1930, up to April 30, 1937, and to $250,000 from May 1, 1930, to April 30, 1938. It has produced testimony by the trustee in the mortgage and by a witness who for several years had been engaged in the securities investment business which, it claims, shows that such construction had been adopted by the parties and is also the one generally applied to similar provisions in handling mortgages in the investment business.

We find no merit in petitioner's contention that paragraph 3 is ambiguous and should be construed as contended by it. The elementary rule for interpreting written contracts is that their meaning must be gathered from the provisions of the instrument as a whole and from the words used according to their natural and ordinary signification, if they be clear and unambiguous. *United States* v. *Choctaw &c. Nations*, 179 U. S. 494, 531. The provisions of paragraph 3 are clear and unambiguous, and are not rendered less so when read in connection with other provisions of the contract. The obligation of the petitioner imposed thereby is to pay the principal of the bonds as they matured annually, together with the interest thereon. The obligation is absolute and unqualified, and nowhere in the deed do we find any provision, express or through necessary implication, for the payment of the obligation to be made from earnings or from any other particular source. The limitation applying to the payment of dividends during the taxable years is that such dividends shall not be paid until the principal of bonds then maturing and interest on all outstanding bonds "shall have been provided for." "Provide", in its ordinary sense, means to procure beforehand; to look out for in advance; to procure means in advance; to take mea-

sures in view of an expected or possible need. Webster's New International Dictionary. The word is sufficiently comprehensive to include procurement from any available source, and to say that earnings alone were intended, as urged by petitioner, would be tantamount to writing a new contract for the parties. We think that when the petitioner periodically used its working capital, reserves, proceeds from sales of its physical assets, and its earnings, as it did, to pay the maturities and interest on the bonds, it "provided for" those obligations within the meaning of the contract; and, petitioner having complied regularly and punctually with the sole condition of paying the interest and principal of the bonds up to and including the whole of the taxable years, the clause containing the quoted words did not have the legal effect of prohibiting payment, within the taxable years, of dividends on the common stock.

The meaning of paragraph 3 being clear and unambiguous, there is no occasion to consider the understanding of its meaning between the trustee and the president of petitioner or the opinion of the witness engaged in the securities investment business as to that meaning; such understanding and opinion being immediately hereinafter set out. 3 Williston on Contracts (R. Ed.), § 623; *Insurance Companies* v. *Wright*, 1 Wall. 456, 471; *Transatlantic Shipping Co.* v. *St. Paul Fire & Marine Ins. Co.*, 9 Fed. (2d) 720; *National Surety Co.* v. *McGreevy*, 64 Fed. (2d) 899.

But even if we should be inclined to regard paragraph 3 as ambiguous, neither the testimony of the trustee as to the understanding between himself and the president of petitioner of the meaning of that paragraph nor the testimony of the witness engaged in the securities investment business as to his opinion of the meaning of that paragraph establishes that the parties adopted the construction contended for in carrying out the contract, or that the words "provided for" have a special and limited meaning in the investment world as contended by petitioner. The trustee admitted that the understanding which he and the president of petitioner had as to the meaning of that paragraph was not had because of any attempt of the latter to declare and pay dividends over his objection as trustee; and the record shows that such understanding of that meaning was not adopted by the petitioner in carrying out the contract, since the bonds and interest were paid as they accrued only in part out of earnings and in other part out of its working capital, reserves, and proceeds from the sale of capital assets. The witness in the investment business who testified as to the meaning of paragraph 3 was a layman and often sought the opinions of attorneys in construing trust deeds, and we doubt that he was qualified to testify here as to a trade or business meaning of such a paragraph; but, however this

may be, the other deeds examined by him in the course of his investment business and on comparison of which with the paragraph here involved he based his opinion, were said by him to be "similar in principle", but not "similar in language" to the one here involved. None of the other deeds examined by him was shown to have contained the words, "shall have been provided for", and his testimony falls far short of proving that those words mean "provided for out of earnings" in the investment business even though the meaning of those words was subject to oral proof.

Having concluded that the language of the deed of trust is unambiguous and that paragraph 3 does not mean that the funds to be used by petitioner in paying its bonds and interest thereon are to be "provided for" only out of earnings, as contended by petitioner, it would seem to be unnecessary to consider petitioner's further contention that no earnings existed during the taxable years which could have been distributed as dividends in those years. However, even if we have erred in reaching this conclusion and if the contention to the contrary by petitioner ought to be sustained, it is our opinion that the petitioner would nevertheless not be entitled to the claimed credits of $30,000 each under the facts shown. Petitioner's earned surplus in the taxable year 1937 was $126,022.05 and its earned surplus in the taxable year 1938 was $158,810.25, and such earned surplus in each of those taxable years far exceeded the amounts necessary in each of such years to make payments of principal and interest on petitioner's bonds as such principal and interest accrued in those respective years, the principal of the bonds maturing in each taxable year being $30,000 and the interest becoming due on the bonds in 1937 being approximately $12,600 and interest due on the bonds in 1938 being approximately $10,800. Petitioner, in support of its contention that no earnings existed during the taxable years which could have been distributed as dividends in those years, says, in effect, that payments on the bonds in the principal amount of $220,000 from May 1, 1930, up to April 30, 1937, and in the principal amount of $250,000 from May 1, 1930, up to April 30, 1938, together with interest paid through those periods, should be now considered as chargeable to the earned surplus as it existed in the taxable years; that there would thereby result a deficit in those years in the earned surplus; and that consequently there would have been nothing left in earnings in those years from which to have made the payments on the bonds and interest which were made during those taxable years. But the conclusive answer to this is that the payments of $30,000 principal plus interest made in each of the taxable years on the bonds were actually made only in part from earnings and in other part from other funds such as working capital, reserves, and proceeds from the sale of

physical assets; and what part was paid from any or each of these sources is not disclosed. Even if petitioner's contention that the deed of trust means that payment of the bonds and interest thereon was to be "provided for" only out of earnings, it could not now be heard to say that its account of earned surplus, which was kept continuously through a period of many years and did not, as so kept, show what part, if any, of the amounts paid on bonds and interest was charged to such account, should now, in effect, be changed so as to charge all bond payments and interest made throughout all years against that account.

A further question presented is whether any credit should be allowed by virtue of the provisions of the resolution of 1921 and the preferred stock certificates issued, namely, that dividends on the preferred stock shall be cumulative and "shall be paid or a sufficient sum for the payment thereof [shall be] set apart and appropriated to such payment before any dividends shall be declared or paid for any other stock." The petitioner contends that, as preferred stock dividends had accumulated since 1933 and remained. unpaid to the extent of $15,702.75 on April 15, 1937, and $13,994.75 on April 15, 1938, it was prohibited from paying any dividends on the common stock in the taxable years.

Even if the above quoted provision from the resolution of 1921 and from the preferred stock certificates renders section 26 (c) (1), *supra*, applicable, a question we do not decide, *Airtherm Manufacturing Co.*, 43 B. T. A. 736, 738, we do not think that Congress intended to grant any relief under that statute in a situation where, as here, the corporation had a large earned surplus and large cash balances on hand in each of the taxable years, and was financially abundantly able to satisfy the contract obligation and remove the restriction. See I. T. 3130, C. B. 1937–2, pp. 107, 109; *Auto Interurban Co.*, 40 B. T. A. 161.

Furthermore, the restriction could have been removed by the petitioner either by payment of the accrued dividends or by setting aside a fund for the payment thereof as provided in the preferred stock certificates and the resolution. The petitioner has proved accrual and nonpayment, but the record is silent as to whether or not any funds were set apart for the payment of the preferred stock dividends. The petitioner has therefore failed to prove that the provisions of the preferred stock certificates and the resolution had the legal effect of prohibiting payment of dividends on common stock within the taxable years. *Honakaa Sugar Co., supra.*

There is further reason for disallowing any credit whatever to the petitioner. Section 26 (c) (1), *supra*, allows a credit equal to the excess of the adjusted net income over the aggregate of the

amounts which can be distributed within the taxable year as dividends without violating a provision of the written contract, et cetera. The record shows that no such excess existed in either of the taxable years. The undisputed adjusted net income is $46,079.36 for 1937 and $43,618.25 for 1938. The earnings accumulated up to the beginning of the taxable year 1937 amounted to $97,802.89 and the earnings of that year amounted to $28,219.16. Even if the petitioner was required by the preferred stock certificates to pay or set apart during that year $15,702.75 for the payment of accumulated dividends, and by the trust deed to pay $30,000 for that current year's bond retirements, and $12,600 for the interest on the outstanding bonds, it would nevertheless have available for distribution on its common stock the amount of $67,719.30. Since the adjusted net income is only $46,079.36, it is obvious that the petitioner is entitled to no credit under section 26 (c) (1), *supra*. A similar computation for the year 1938, made on the basis of the earned surplus at the beginning of that year of $126,022.05 and earnings during the year of $32,788.20, and the deduction therefrom of accumulated dividends on preferred stock in the amount of $13,994.75, and bond retirements of $30,000 and interest thereon of $10,800, results in an amount available in 1938 for distribution on the common stock of $104,015.50, which is in excess of the adjusted net income of $43,618.25. The use of the earnings accumulated from prior years in making the computation under the statute is proper, since the statute does not restrict "amounts which can be distributed" to income of the taxable year. *Monroe Abstract Corporation*, 41 B. T. A. 5.

In view of our conclusion that the petitioner is not entitled to any credit whatever, either on account of the alleged restrictions in the deed of trust, or on account of those in the preferred stock certificates, it follows that the respondent's determination of deficiencies for the respective taxable years is approved, and further that there have been no overpayments by petitioner in either one of those taxable years.

*Decision will be entered for the respondent.*